Wallace **FORMAN**, Plaintiff–Appellant,

v.

**UNITED STATES**, Defendant–Appellee.

No. 02–5117.

United States Court of Appeals,
Federal Circuit.

May 16, 2003.

Marc Lamer, Kostos & Lamer, P.C., of Philadelphia, PA, argued for plaintiff-appellant.

Martin F. Hockey, Jr., Senior Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief was David M. Cohen, Director.

Before BRYSON, GAJARSA, and PROST, Circuit Judges.

Opinion for the Court filed by Circuit Judge GAJARSA. Opinion concurring in part and dissenting in part filed by Circuit Judge BRYSON.

GAJARSA, Circuit Judge.

Wallace Forman ("Forman") brought suit in the United States Court of Federal Claims for reimbursement of expenses allegedly incurred pursuant to an agreement with the Federal Bureau of Investigation ("FBI"). These expenses include: (1) travel expenses and related costs; (2) product manufacturing and marketing costs; (3) advertising and seminar expenses; (4) business loans; (5) a product license payment; and (6) an employee's salary. The Court of Federal Claims granted the government's motion for sum-

mary judgment, holding that Forman failed to follow the procedures required by the contract for reimbursement of expenses. *Forman v. United States,* No. 99–489C (Fed.Cl. Mar. 13, 2002). We conclude that there exist genuine issues of material fact with respect to Forman's hiring and employment of a company salesman, and whether or not this hiring was at the direction of the FBI. We therefore hold that the Court of Federal Claims improperly granted the government's motion for summary judgment with regard to whether Forman is entitled to reimbursement of the employee's salary and other expenses, and accordingly affirm-in-part, reverse-in-part, and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

In September 1988, Forman signed a pre-indictment plea agreement with the FBI resulting from charges against him arising from an FBI investigation, entitled "Operation Thimble." This investigation targeted clothing industry corruption involving defense contracts awarded by the Defense Personnel Support Center. Operation Thimble investigated allegations of corruption of many parties involved in government contracting, including those that offered bribes (e.g., private business consultants), and those that accepted them (e.g., federal procurement officials). One of the private consultants targeted was Jules Wertheimer ("Wertheimer"), a longtime consultant in the industry. Evidence obtained by the FBI against Wertheimer, however, was insufficient for any criminal charges. In order to develop a stronger case against Wertheimer, the FBI enlisted Forman's aid. Forman, in an effort to reduce his own sentence resulting from Operation Thimble, signed a formal agreement (the "Agreement") to cooperate actively with the FBI in the investigation

targeting Wertheimer, entitled "Operation Extra Gold."

The Agreement, the interpretation of which is ultimately the subject of this appeal, was relatively short (less than five pages) and signed by Forman and an authorized agent of the FBI. The most critical paragraphs are reproduced below:

5) The FBI shall reimburse FORMAN for expenses incurred by him which are deemed by the FBI to be reasonable and in furtherance of this investigation. *FORMAN agrees that prior to incurring such expenses, he will consult with the FBI's designated representative as to the nature and justification for incurring expenses. The FBI has the right to direct FORMAN not to incur expenses which the FBI deems not to be in furtherance of its investigative goals.*

7) FORMAN shall not obligate or attempt to obligate the FBI, or any employee thereof, in any financial or contractual agreement, written or oral, without the prior express authorization of the FBI.

\* \* \*

10) *FORMAN agrees, when directed by the FBI, to testify* and furnish all information in his possession, custody or control, which he has received during the course of, or related to, this investigation.

\* \* \*

13) The FBI is responsible for the financing of all aspects of this investigation, which in its discretion will further its investigative goals.

\* \* \*

18) *FORMAN will not economically benefit personally when entering into contractual agreements with the Government when the following occurs: The*

*FBI has requested FORMAN to formally solicit the Government business and the subsequent contract has been tainted by deceit, bribery or fraud caused by the undercover investigation.* ... FOR-MAN will also, on a quarterly basis, place his profits of each tainted contract in a separate trust account for return to the Government at the conclusion of the investigation.

\* \* \*

20) It is further expressly understood that the FBI assumes no responsibility or liability for any business or income losses which may result to FORMAN and INDUSTRION as a result of his entry into this agreement.

\* \* \*

25) This Agreement shall commence on the date of acceptance by FORMAN as signified by his signature, and *shall continue as long as the FBI deemed that FORMAN's services are required.* It may be terminated at any time by either party by deliverance of a written notice of termination.

(Emphases added).

Forman's role in Operation Extra Gold was to establish and operate a textile company known as "Pyro–Shield." To the outside observer, Pyro–Shield was a legitimate, for-profit enterprise that manufactured and marketed a patented fireproof fabric referred to as "Sandel." Forman licensed rights from the patent owner, Daniel Ferziger ("Ferziger"), to make and sell Sandel. Forman promoted Pyro–Shield through advertising, seminars, video sales presentations, literature, and sales trips. He hired and employed a salesman, one Martin Reiser ("Reiser"), to help develop the company business. He also contacted former procurement officials at various government agencies in attempts to market Sandel. Pyro–Shield also attracted the attention of an outside investor, Northeast Investors Corporation ("Northeast"). Northeast, however, was an entirely fictitious front company, composed solely of undercover agents ("UCAs") of the FBI. Forman, through Pyro–Shield, provided an entry point for the UCAs into the clothing industry and the potential identification of corrupt practices and its perpetrators.

Forman made the first introductions of the UCAs to the ultimate target of Operation Extra Gold, Wertheimer. His cooperation, however, extended beyond simple introductions. Forman often wore concealed wires and made recordings of conversations. He also testified at grand jury and trial proceedings for the FBI. In fact, during Forman's sentencing after the conclusion of Operation Extra Gold, the district court judge characterized Forman's cooperation as "exceptional." Ultimately, Operation Extra Gold led to the arrest and conviction of Wertheimer and others. Forman testified, in accordance with Paragraph 10 of the Agreement, at Wertheimer's trial in September, 1993.

After testifying at Wertheimer's trial, Forman requested reimbursement from the FBI for certain expenses incurred during the course of the undercover operation, including: (1) general travel expenses and related costs, $20,972.68; (2) Sandel production and marketing costs, $40,518.10; (3) advertising and seminar expenses, $23,530.98; (4) loans to the Sandel patentee, Ferziger, $126,798.40; (5) an exclusive license for Sandel, $50,000; and (6) salary and expenses related to Forman's hiring of Reiser, $40,341.50.

Forman's request for reimbursement of all these expenses was denied by the FBI on June 19, 1995. The FBI's Chief Contracting Officer later denied Forman's appeal (with the exception of $5,000 in travel

expenses) on April 14, 1999, because Forman failed to obtain authorization from the FBI before incurring the expenses, in violation of the contract. In July 1999, Forman filed a complaint with the Court of Federal Claims. The court denied the government's motion to dismiss for lack of jurisdiction. Contrary to the government's assertions that the six-year statute of limitations began to run when the expenses were incurred, the court noted that the FBI denied Forman's claim for reimbursement in June 1995, and by filing suit by July 1999, he was well within the statute of limitations under the Tucker Act, 28 U.S.C. § 2501. Nevertheless, the Court of Federal Claims granted summary judgment for the government, stating that the Agreement required explicit prior approval of expenses by the FBI, which Forman never obtained. Forman filed a timely appeal with this court, and we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

## II. DISCUSSION

Whether we have jurisdiction to adjudicate a particular issue on appeal is a question of law. *Palmer v. Barram,* 184 F.3d 1373, 1377 (Fed.Cir.1999). Interpretation of a government contract is a question of law, subject to *de novo* review on appeal. *C. Sanchez & Son v. United States,* 6 F.3d 1539, 1544 (Fed.Cir.1993). The grant of summary judgment on a question of law is subject to *de novo* review. *Seaboard Lumber Co. v. United States,* 308 F.3d 1283, 1292 (Fed.Cir.2002). Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### A.

On appeal, the government first argues that the Court of Federal Claims erred by hearing Forman's appeal. The government asserts that the court lacked jurisdiction for two reasons. First, it argues that Operation Extra Gold's "last investigative activity" was concluded in January 1991, over eight years prior to the case being brought to the Court of Federal Claims, well outside the six-year statute of limitations under the Tucker Act. *See* 28 U.S.C. § 2501 (2000). Second, the government argues that pursuant to the Contract Disputes Act ("CDA"), the one-year statute of limitations had tolled when Forman brought his appeal from the June 19, 1995 decision of the FBI Chief Contracting Officer in July,1999. *See* 41 U.S.C. § 609(a)(3) (2000).

The Court of Federal Claims may not consider claims and grant relief against the government, absent statutory authority. *United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). This authority must be strictly construed. *Hart v. United States,* 910 F.2d 815, 817 (Fed.Cir.1990). In the case of the Court of Federal Claims, one example of statutory authority to consider claims is based on the Tucker Act, 28 U.S.C. § 1491. The statute of limitations is an express limitation on the Tucker Act's waiver of sovereign immunity. *Soriano v. United States,* 352 U.S. 270, 273–74, 77 S.Ct. 269, 1 L.Ed.2d 306 (1957); *Hart,* 910 F.2d at 817. Indeed, "[e]very claim of which the United States Claims Court has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501 (2000). The claim first accrues when all events have occurred that fix government liability and entitle the claimant to institute an action. *Hart,* 910 F.2d at 817. Therefore, when Forman's perfor-

mance of the contract was complete, FBI liability was fixed, the claim first accrued, and the six-year statute of limitations began to run. We must determine, then, the time at which Forman's performance was complete. This determination requires interpretation of the contract.

■ In interpreting a contract, "[w]e begin with the plain language." *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed.Cir.1996). "We give the words of the agreement their ordinary meaning unless the parties mutually intended and agreed to an alternative meaning." *Harris v. Dep't of Veterans Affairs*, 142 F.3d 1463, 1467 (Fed.Cir.1998). The court generally does not resort to parol evidence when the provisions in the contract are clear and unambiguous. *McAbee*, 97 F.3d at 1435, *but cf., Metric Constructors, Inc. v. Nat'l Aeronautics & Space Admin.*, 169 F.3d 747, 752 (Fed.Cir. 1999) (addressing the use of extrinsic evidence of trade practice and custom in contract interpretation of unambiguous terms). In addition, "[w]e must interpret the contract in a manner that gives meaning to all of its provisions and makes sense." *Id.*

■ As neither party argues that a mutually intended and agreed to alternative meaning exists, we must construe the contract as written, without reliance on any parol evidence. Paragraph 25 indicates that the Agreement "shall continue as long as the FBI deemed that FORMAN's services are required." Those services included running Pyro–Shield as a legitimate business for Operation Extra Gold. Contrary to the FBI's assertion, however, Forman's participation pursuant to the agreement was not limited simply to "investigative activities," e.g., operating Pyro–Shield and surreptitiously recording conversations. Paragraph 10 of the Agreement specifically points out that Forman would testify when directed by the FBI. Thus, testifying was one of the services Forman agreed to perform. Indeed, Assistant U.S. Attorney Hoffa ("Hoffa") indicated in a December 13, 1993 letter to the Defense Logistics Agency that Forman's cooperation as a witness in Operation Extra Gold was a necessary service. Hoffa wrote that "[i]n 1988, Forman executed his plea agreement and from that date until September of this year he worked with the [FBI] in supporting their [operation]." Hoffa also noted that "[a]s part of his cooperation, Forman ... testified in the grand jury and at trial."

Therefore, Forman completed his duties under the Agreement when he testified for the United States against Wertheimer in September 1993, as required by the Agreement and as expected by the FBI. That testimony, the final step of Forman's cooperation with the FBI, fixed the time from which the potential liability of the government began to run. To read Paragraph 10 out of the contract (i.e., to assert, as the government does, that Forman's testimony was not a required aspect of the contract) would indeed vitiate the requirement of that provision. Accordingly, Forman had six years from September, 1993 to file his claim with the Court of Federal Claims. *See* 28 U.S.C. § 2501. Forman filed his complaint in July of 1999. Thus, the Court of Federal Claims had jurisdiction to hear the case.[1]

**B.**

■ Having determined that jurisdiction is proper, we turn to the merits of the case, primarily whether the contract provides for reimbursement of various ex-

---

1. Because we determine jurisdiction exists under the Tucker Act, we need not address the parties' arguments regarding the statute of limitations under the CDA.

penses incurred by Forman. "A contract is read in accordance with its express terms and the plain meaning thereof." *C. Sanchez & Son*, 6 F.3d at 1543. The Court of Federal Claims read Paragraph 5 of the Agreement to mean that "plaintiff was required to obtain *specific* approval before incurring expenses for which he expected to be reimbursed." (Emphasis added). The government contends both in its brief and at oral argument that it is not required to reimburse Forman for any expenses for which he did not obtain *express* approval before proceeding with the expenditure. Forman, on the other hand, argues that all that was required under Paragraph 5 was that he *consult* with the FBI before incurring any expenses. Forman contends only after consulting with the FBI could the FBI choose not to reimburse him for the amounts in question. In instances where the FBI did not prohibit Forman from incurring the expenses, Forman argues that those expenses were at least implicitly approved by the FBI.

We find the position adopted by the government is not supported by the plain language of the Agreement. On its face, Paragraph 5 clearly does not require "explicit" or "specific" pre-approval; rather, that Forman "consult with the FBI's designated representative as to the nature and justification for incurring expenses." Additionally, Paragraph 5 of the Agreement clearly states that the only expenses reimbursable by the FBI were those that "are deemed by the FBI to be reasonable and in furtherance of this investigation." After consultation, if the FBI deemed the expenses "not to be in furtherance of its investigative goals," it could instruct Forman not to incur those expenses. Thus, if Forman consulted with the FBI regarding an expense, Forman would be responsible for that expense if the FBI directed him not to incur it.

Other paragraphs in the Agreement, however, explicitly limit the expenses the FBI is required to reimburse. Nothing in the Agreement indicates Forman was not entitled to any legitimate profits from operating Pyro–Shield. Indeed, the Agreement memorializes the parties' intent that Forman would operate a legitimate, for-profit business and keep legitimately generated profits. Only Paragraph 18 limits the profits that Forman would be entitled to: "FORMAN will not economically benefit personally when entering into contractual agreements with the Government when the following occurs: The FBI has requested FORMAN to formally solicit the Government business and the subsequent contract has been tainted by deceit, bribery or fraud caused by the undercover investigation." Paragraph 20 of the Agreement indicates that the FBI would not be responsible for any economic losses that Forman would incur during his cooperation with the FBI. Paragraph 13 does note that the FBI would finance any (and presumably, only) investigative expenses of the investigation.

It follows then, from the plain language of the Agreement, that economic gains and losses on the part of Forman that arose while maintaining Pyro–Shield as a legitimate business would be borne by Forman himself. Economic gains resulting from any tainted Government business would not accrue to Forman, and any losses that resulted from the FBI's investigation would be borne by the FBI. The FBI, not Forman, was entitled to any gains that were tainted, in accordance with Paragraph 18. Under Paragraph 13, the FBI, not Forman, would direct and finance the investigative aspect of the Agreement. Thus, summary judgment was proper if, under the plain language of the Agreement, there are no genuine issues of material fact regarding which party (either

Forman or the FBI) was responsible for any particular expense.

Expenses that were in furtherance of the investigation were to be paid for by the FBI, provided Forman consulted the FBI prior to incurring such expenses. Conversely, any expenses related to the legitimate business operation of Pyro–Shield are beyond the scope of reimbursement. There are six types of specific expenses in this case: (1) general travel expenses and related costs; (2) Sandel production and marketing costs; (3) advertising and seminar expenses; (4) loans to Ferziger; (5) the Sandel license; and (6) Reiser's salary. We will address each in turn.

*Travel, Production and Marketing, and Advertising and Seminar Expenses*

■ The first three expenses are, without question, the types that would be ordinarily incurred within the ordinary course of any business that seeks a profit. The Agreement only limited Forman's profits to those that were obtained illegally. Thus, any other profit that Forman could turn in this venture (either to private commercial contracts, or untainted government contracts) was for the company's account by the plain language of the Agreement. It was clearly in Forman's interest to operate the business with the same effort as if Pyro–Shield was a completely legitimate business. The travel costs and advertising and seminar costs generally are incurred by any business venture that requires obtaining the attention of consumers in the marketplace. Similarly, marketing and production of the Sandel fabric is another typical business expense. By the plain language of the Agreement, the FBI is not required to reimburse such expenses.

*Loans to Ferziger*

■ The FBI also refused to reimburse Forman for loans he made to Ferziger.

Forman contends in his brief that the loans to Ferziger were critical for the successful portrayal of Pyro–Shield as a legitimate business enterprise, and therefore, the successful functioning of the investigation. Statements made by Forman during his deposition, however, reveal the true nature of the loans. Ferziger's company, Fire Safe Products, was responsible for purchasing raw fabric, which was delivered to production facilities affiliated with Pyro–Shield, where it was made into Sandel through a series of chemical treatments. Apparently, Ferziger was having financial difficulties; he was unable to meet his payroll and unable to purchase the raw fabric. Ferziger informed Forman that he was considering shutting down Fire Safe Products or completely selling his rights in Sandel unless he could obtain some type of financial support. Forman also believed that Ferziger's financial difficulties would pose a difficulty in developing "that product [Sandel] on a worldwide basis."

Forman attempted to locate an underwriter to develop a public offering for Ferziger's company. Hoffa, however, refused to permit a company with an affiliation to an undercover FBI investigation to go public in an effort to raise funds. The disclosure requirement for any public offering required by the securities laws and the Securities and Exchange Commission ("SEC") would be detrimental to the undercover operation. With the option of going public eliminated, Forman underwrote the loans to Ferzinger.

The loans to Ferziger were the type of expense incurred in the ordinary course of maintaining and expanding a business. As Forman stated in his deposition, Ferziger needed additional funds to meet his financial obligations and to make his company and product viable on the world market. The marketing of the product, especially

worldwide, was not the primary focus of the FBI investigation. The FBI's prime concern was domestic government corruption. Thus, the FBI's refusal to reimburse Forman for expenses related to legitimate business objectives, namely, developing Sandel on a worldwide basis, was proper under Paragraphs 5 and 13 of the Agreement. Moreover, Forman's assertion that the loans were critical for the financial stability of Ferziger and ultimately the success of the investigation lacks merit. Indeed, under Paragraphs 5 and 13, it is the FBI's discretion, not Forman's, that matters in determining which expenses would further the investigative goals.

The FBI also never implied that Forman should maintain the financial viability of Ferziger; the FBI limited Forman from obtaining funds which required a public disclosure. Moreover, the FBI did not prohibit Forman from obtaining the financing for Ferziger's company by other means (such as private loans). There is no requirement under the Agreement that the FBI reimburse Forman for costs associated with supporting Ferziger's company or attempting to increase the market of Sandel.

### The Sandel License

■ A review of the record indicates that the Sandel license was also an ordinary business-related expense, not an investigative expense as Forman contends in his brief. While Forman contends that he did not know he would need a license for Sandel, this is contrary to his deposition testimony. In his deposition, Forman stated that, concurrent with the negotiations with the FBI regarding the scope of the Agreement, Ferziger informed him that a license would be required. Indeed, the Agreement was signed several months after Ferziger told Forman that a license was required. It was Ferziger, not the FBI, who demanded the license payment

as a condition to Pyro–Shield manufacturing and marketing Sandel. Forman, in the scope of his normal business, entered into the license, albeit reluctantly, but not under pressure from the FBI. Therefore, under the plain language of the Agreement, the Sandel license was an ordinary business expense necessary for Pyro–Shield to market Sandel.

### Reiser's Salary

■ There is, however, one expense where an issue of material fact exists: the hiring of Reiser. Forman hired Reiser as a company salesman, he contends at the insistence of the FBI. Reiser, representing Pyro–Shield, attended trade shows and exhibitions, occasionally without Forman accompanying him. Pyro–Shield paid Reiser's salary and reimbursed him for costs to attend shows and visit customers on sales trips. Forman contends, and the government does not dispute, that Reiser was related to Wertheimer, the primary target of the investigation. Wertheimer, Forman argues, used his relationship with the UCAs to insist that Forman hire Reiser, apparently so Wertheimer could monitor Pyro–Shield. Not wanting to risk alienating Wertheimer, Forman asserts that the FBI insisted that Reiser be hired. In his deposition, Forman also asserts that without pressure from the FBI, he never would have hired Reiser for at least two reasons. First, Reiser had no experience in the business and no knowledge of the product area. In fact, Forman contends Reiser never developed any business for the company. Second, Forman was concerned that Reiser would discover the undercover nature of Pyro–Shield and alert Wertheimer. The government presents little rebuttal to these arguments other than its general assertion that the Reiser expenses are not reimbursable because Forman failed to get explicit approval for

them. Understanding that Reiser had a relationship with the subject of the investigation (Wertheimer), we conclude that Forman presents a genuine issue of material fact regarding the hiring and employing of Reiser, during the period of the investigation, that requires a remand for further proceedings consistent with this opinion.

## III. CONCLUSION

Accordingly, we affirm-in-part the Court of Federal Claims's grant of summary judgment with regard to expenses enumerated above as (1) through (5). On the issue of the expense of employing Martin Reiser, we reverse-in-part and remand for further proceedings consistent with this opinion.

## IV. COSTS

No costs.

*AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.*

BRYSON, Circuit Judge, concurring in part and dissenting in part.

I agree with the court in rejecting the government's argument that Mr. Forman's claim was barred by the statute of limitations. I also agree with the court that the agreement between Mr. Forman and the FBI did not require him to obtain express approval of any expenditure he made in the course of the undercover operation in order to be eligible for reimbursement for that expenditure. And I agree with the court's implicit rejection of the government's argument that in order to obtain reimbursement of expenses under the agreement Mr. Forman was required to obtain approval from officials at a level higher than the case agents and the Assistant United States Attorney.

In one important respect, however, I disagree with the court's reading of the reimbursement agreement. Paragraph 5 of the agreement, the critical portion of the agreement for present purposes, provides:

The FBI shall reimburse FORMAN for expenses incurred by him which are deemed by the FBI to be reasonable and in furtherance of this investigation. FORMAN agrees that prior to incurring such expenses, he will consult with the FBI's designated representative as to the nature and justification for incurring such expenses. The FBI has the right to direct FORMAN not to incur expenses which the FBI deems not to be in furtherance of its investigative goals.

The plain meaning of paragraph 5 is that the FBI agreed to reimburse Mr. Forman for all expenses that Mr. Forman incurred in furtherance of the investigation and that in order to protect his right to reimbursement, Mr. Forman was required to consult with the FBI before incurring any such expenses. The FBI reserved the right to direct him not to incur particular expenses if the FBI concluded that the particular expenses in question were not in furtherance of the investigation. The consequence of Mr. Forman's disregard for such directions, although not spelled out in the agreement, would clearly be, at least, denial of the right to reimbursement for those unauthorized expenses.

Paragraph 5 seems to me to cover any expense that Mr. Forman incurred in the course of the undercover operation as long as Mr. Forman consulted with the FBI regarding the expense and the FBI did not advise him not to incur the expense or tell him that the FBI would not reimburse him for it. There is at least a disputed question of fact as to whether Mr. Forman consulted with the FBI or the Assistant

United States Attorney in charge of the investigation with respect to a number of the expenses he incurred in the course of the undercover investigation, including the salary paid to Martin Reiser, the cost of the Sandel license, and certain marketing and travel costs incurred by Mr. Forman. In some instances, according to Mr. Forman, the agents and the Assistant United States Attorney directed him to incur those expenses. He asserts that in other instances he consulted with the agents or the Assistant United States Attorney and they did not direct him not to incur the expenses in question. Accepting Mr. Forman's version of the facts for purposes of summary judgment, those expenses would therefore appear to be reimbursable under paragraph 5 of the agreement.

The court does not adopt this straightforward interpretation of the agreement between Mr. Forman and the FBI, but instead relies on a different paragraph of the agreement, paragraph 20, to qualify the FBI's reimbursement obligations under paragraph 5. Paragraph 20 provides as follows:

It is further expressly understood that the FBI assumes no responsibility or liability for any business or income losses which may result to FORMAN and INDUSTRION as a result of his entry into this agreement.

The court interprets paragraph 20 as meaning that any "expenses related to the legitimate business operation of Pyro–Shield are beyond the scope of reimbursement." The court then concludes that because Pyro–Shield would have had to conduct marketing and advertising, and would have had to purchase the Sandel license to engage in the business that served as a cover for the undercover operation, Mr. Forman was responsible for all those categories of expenses. As the court explains with respect to the travel, production and marketing, and advertising and seminar expenses, those expenses are "the types that would ordinarily be incurred within the ordinary course of any business that seeks a profit."

I disagree with that reading of paragraph 20. That paragraph merely provides that the FBI would not be liable for Forman's business losses. It does not provide that he was to be responsible for all expenses related in any way to his business, even if the FBI specifically directed him to incur those expenses, and even if he would not have incurred those expenses (or same amount of expenses) if he had not been directed to do so. It seems to me clear that paragraph 20 was intended to ensure that Mr. Forman would not attempt to hold the FBI liable for the destruction of the value of his business as a result of the undercover operation, or any loss of business that he would otherwise have been able to transact if he had not been involved in the undercover operation. It is quite a bit different—and, to me, unjustified by the language of paragraph 20—to interpret that language as qualifying the obligations of paragraph 5 to free the FBI from having to reimburse Mr. Forman for any expense it required him to incur, as long as the expense was akin to one that a person in Mr. Forman's position might have had to incur in running a legitimate business of the same kind.

To the extent there is any ambiguity in the agreement, that ambiguity should be resolved against the government as the drafter of the agreement. If the government had wished to have the agreement interpreted as the court interprets it today, it should have drafted it in that fashion, but it did not. Nor does this interpretation of the agreement leave the FBI vulnerable to excessive reimbursement obligations. Under the agreement, Mr. Forman was required to consult with the FBI

with respect to all expenses as to which he planned to seek reimbursement, and the FBI was free to decline to authorize any expense that it regarded as furthering Mr. Forman's legitimate business but not aiding the investigation.

In light of this interpretation of the agreement, I would hold that the government is not entitled to summary judgment with respect to any of the expenses as to which he consulted with the FBI or the Assistant United States Attorney. Thus, I would not affirm the grant of summary judgment to the government on Mr. Forman's claims for travel expenses and related costs, the product marketing costs, the advertising and seminar expenses, the Sandel license, and Reiser's salary. With respect to the Sandel license, Mr. Forman offered evidence that the Assistant United States Attorney directed him to obtain that license even though he was reluctant to do so. I therefore disagree with the court's characterization of the license as having been obtained "not under pressure from the FBI." Mr. Forman also offered evidence that the FBI instructed him to attend trade shows, seminars, and conventions at which he marketed Sandel. That evidence is sufficient to withstand the government's motion for summary judgment, and I would therefore remand those claims for further proceedings.

I agree with the court, however, that the Ferziger loan was not reimbursable, because as I read the record there is no evidence that Mr. Forman consulted with the FBI or any other government official in advance of entering that transaction. Similarly, there is no evidence that Mr. Forman consulted with any government official with respect to any manufacturing costs to produce Sandel. Mr. Forman's statement that he was told to create a functioning company and that manufacturing costs fall within that general direction is insufficient to support the required condition that he consult with government officials prior to incurring the expenditure. Moreover, Mr. Forman states that he and the FBI agreed that he would create a company to market Sandel. At that time, a company entirely unrelated to Mr. Forman was already manufacturing Sandel. It was not until much later that Mr. Forman decided to manufacture Sandel himself. He never alleged that the FBI directed him to undertake that activity, and he has failed to offer evidence of the requisite consultation with respect to expenses associated with Sandel production.

There are a number of facts in dispute between the parties, and it may be that after further factual development this case would have a very different look. Because the case was decided against Mr. Forman on summary judgment, however, we have to accept his version of the facts. And under that version of the facts, I cannot agree with the court that Mr. Forman is legally barred from recovering on any of his claims except the salary for Martin Reiser.

To that extent, I respectfully dissent.