Wallace FORMAN, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. 99–489C.

United States Court of Federal Claims.

Filed: Aug. 31, 2004.

Re–Issued for Publication Sept. 22, 2004.[1]

Marc Lamer, Kostos & Lamer, P.C., Philadelphia, PA, for plaintiff.

Martin Hockey, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, for defendant.

## OPINION

HODGES, Judge.

We ruled in March 2002 that plaintiff Wallace Forman was not entitled to reimbursement of various expenses that he incurred in connection with an undercover FBI operation. *Forman v. United States*, No. 99–489 (Fed.Cl. Mar. 13, 2002) (order granting summary judgment). The Court of Appeals for the Federal Circuit remanded one of plaintiff's claims for trial. That claim relates to Forman's request for reimbursement of his expenses of hiring Martin Reiser as a salesman. We conducted a trial to determine whether the FBI is responsible for Forman's expenses of employing Reiser, based on the Federal Circuit's interpretation of the parties' contract. Plaintiff is entitled to reimbursement of salary and expenses totaling $33,051.43.

## BACKGROUND

The FBI indicted Wallace Forman in connection with a sting operation known as Operation Thimble. Operation Thimble was an undercover operation launched in the late 1980's to investigate bribery and corruption in the textile industry. Forman signed a pre-indictment plea agreement. Forman agreed to assist the FBI in a subsequent undercover operation known as Operation Extra Gold. This operation targeted Jules Wertheimer, a textile consultant and former business associate of Forman, and two Small Business Administration attorneys, Paul Pumpian and Jerry Lawson.

Plaintiff's contract with the Government required him to operate an apparently legitimate business called PyroShield as a front for the FBI. Forman established PyroShield as a subsidiary of his own company, Industrion. FBI undercover agents formed two additional businesses, Kevin Moran Associates and Northeast Investors, as financial

---

1. This Opinion was issued under seal on August 31, 2004. The parties do not object to its being    released for publication.

backers of PyroShield. The contract provided that Forman would operate PyroShield as a legitimate business to protect the undercover operation. Plaintiff was free to decide which products the business would market and how they would be marketed. The FBI agreed to reimburse expenses that plaintiff incurred as a result of the investigation so long as Forman consulted with the FBI "prior to incurring such expenses." The FBI could reject any expenditure that it did not consider to be in furtherance of its investigative goals.

Forman marketed a product called Sandel through PyroShield. Sandel is a fire-retardant material similar to asbestos. The patent-holder for this material is Daniel Ferziger. Forman obtained a license from Ferziger to market and sell Sandel products. Plaintiff thought it might be the type of product that would attract the attention of Jules Wertheimer, who was one of the FBI's targets. This would provide plaintiff an opportunity to establish contact with Wertheimer for the investigation. In fact, Wertheimer soon contacted Forman to arrange a meeting at his apartment in Manhattan. The meeting was attended by Forman, Wertheimer, SBA attorneys Lawson and Pumpian, and Martin Reiser. There, Wertheimer encouraged plaintiff to hire Reiser because he said Reiser would be a good salesman of Sandel. Reiser had connections in the health care industry. Apparently, Wertheimer wanted Reiser on the "inside" because he suspected Forman of working with the Government to obtain indictments. Reiser was Paul Pumpian's brother-in-law.

Forman testified that he reluctantly agreed to retain Reiser at the insistence of Wertheimer and the other targets of the investigation. Forman thought Reiser could be successful in marketing Sandel products, such as fire-retardant mattress covers, to health care facilities and hospitals. Plaintiff entered into a Letter of Agreement with Reiser in 1989 regarding Reiser's obligations as a salesman for PyroShield. Reiser started as a commissioned salesman, but Forman testified that he was pressured to pay Reiser on a weekly basis.

The FBI concluded Operation Extra Gold in January 1991. Forman testified that he was not informed of this until the FBI asked him to notify the targets of his involvement in the Operation and to testify against them. Plaintiff had paid Reiser $600 per week for 60 weeks by then, totaling $38,051.43 in salary and miscellaneous expenses. Plaintiff sought reimbursement for his expenses in March 1995. The FBI paid $5,000 to Forman, but refused to pay more.

### Prior Proceedings

The FBI rejected several of plaintiff's claims for reimbursement because of a disagreement concerning Forman's obligation to "consult" with the FBI before expending funds. We ruled on summary judgment that plaintiff was not entitled to reimbursement because he had not obtained specific approval from the FBI before incurring such expenses. *See Forman v. United States*, No. 99–489 (Fed.Cl. Mar. 13, 2002) (order granting summary judgment). The basis for this ruling was paragraph 5 of the contract between the parties:

> The FBI shall reimburse FORMAN for expenses incurred by him which are deemed by the FBI to be reasonable and in furtherance of this investigation. FORMAN agrees that prior to incurring such expenses, he will consult with the FBI's designated representative as to the nature and justification for incurring such expenses. The FBI has the right to direct FORMAN not to incur expenses which the FBI deems not to be in furtherance of its investigative goals.

The Government argued that plaintiff was required to obtain prior authorization for all expenses incurred in furtherance of the FBI's investigative goals. Plaintiff maintained that he did not need prior approval so long as the FBI knew of and did not object to the expenses. We ruled that plaintiff was not entitled to reimbursement because he "was required to obtain specific approval before incurring expenses for which he expected to be reimbursed." *See Forman v. United States*, No. 99–489 (Fed.Cl. Mar. 13, 2002).

Plaintiff appealed the ruling on summary judgment. The Federal Circuit affirmed this

court's denial of Forman's expenses of travel, seminar costs, and his cost of purchasing a license to sell Sandel products. *Forman v. United States,* 329 F.3d 837, 843 (Fed.Cir. 2003). The Federal Circuit ruled that these expenses were associated with the operation of a legitimate business. *See id.* These costs were the type of expense incurred in the ordinary course of business and not in furtherance of the investigation. The FBI was to pay expenses that were incurred in furtherance of the investigation, but expenses related to the legitimate business operation of Pyro–Shield were beyond the scope of the agreement. *Id.* Forman made several loans to Ferziger, the individual from whom he bought the license to manufacture Sandel products. The Federal Circuit held that these expenses too were incurred in the ordinary course of maintaining and expanding a business. *Id.* The purpose of the loans was to assist in the worldwide marketing of Sandel, and such marketing efforts were not goals of the investigation. Therefore, the FBI was not responsible for reimbursing Forman's loans to Ferziger. *Id.*

The court of appeals held that Forman's claim for reimbursement of his costs of employing Reiser did not require advance approval, however, if the parties consulted with each other. The Circuit did not define the meaning of "consult" in its Opinion, but stated that the contract "clearly does not require 'explicit' or 'specific' pre-approval; rather that Forman 'consult' with the FBI." *Forman,* 329 F.3d at 843. If the FBI was aware of an expense that Forman was incurring or contemplating, "it could instruct Forman not to incur those expenses." *Id.*

## DISCUSSION

Evidence presented at trial showed that Forman cooperated with the FBI and was successful in helping the Government obtain indictments. United States Attorney Hoffa wrote in a December 1993 letter, "Wallace Forman has provided substantial and important cooperation—the kind often needed and promised but seldom given. Perhaps what distinguishes his cooperation from most other cases is its duration and success."

Plaintiff's contract with the FBI included the following provisions:

The FBI shall reimburse FORMAN for expenses incurred by him which are deemed by the FBI to be reasonable and in furtherance of this investigation. FORMAN agrees that prior to incurring such expenses, he will consult with the FBI's designated representative as to the nature and justification for incurring such expenses. The FBI has the right to direct FORMAN not to incur expenses which the FBI deems not to be in furtherance of its investigative goals.

FORMAN shall not obligate or attempt to obligate the FBI, or any employee thereof, in any financial or contractual agreement, written or oral, without the prior express authorization of the FBI.

The FBI is responsible for the financing of all aspects of this investigation, which in its discretion will further its investigative goals.

FORMAN shall have no authority, actual or implied, to obligate and/or bind the FBI to any contractual duty and/or obligation, and any obligations so made are the sole obligation of FORMAN and not the FBI. It is understood that the FBI at its sole discretion will control all investigative activities including any decision to terminate this investigation.

### A. Hiring Martin Reiser

Forman argues that the FBI essentially directed him to employ Reiser as a salesman because targets of the investigation pressed FBI undercover agents on the issue. FBI personnel denied that they directed Forman to hire Martin Reiser. They explained at trial that if they had directed Forman to hire Reiser a requisition would have been written to seek permission from FBI supervisors. No such requisition was filed. An FBI agent testified that he thought Forman had retained Reiser for Forman's own business reasons. He assumed that Reiser would be helpful in selling Sandel products. The agent stated that the roles of agents were related to the "government side" of Operation Extra Gold, suggesting that Forman had discretion to do what he wanted on the "com-

mercial side." The Government asserted at trial that it had no say in what Forman did commercially with the Sandel product. Forman was free to hire whomever he wanted and to run the business as he wished. Accordingly, the FBI would not have required Forman to hire Reiser.

Plaintiff stated that he would not have hired Reiser had it not been for direction from the FBI and the targets. He did not seek out Reiser as an employee; Forman was introduced to Reiser through targets of the investigation. Reiser "did not sell one yard of the Sandel fabric," plaintiff testified. An FBI report dated October 14, 1989 states, "[d]uring meetings in August, [undercover agents] have also been requested to hire a Sales Representative[,] Martin Reiser. [Targets] Lawson and Pumpian have strongly urged hiring Reiser in selling 'Sandel' commercial end item goods." Agents wrote in another report, "Pumpian strongly suggested to [undercover agents] that [plaintiff] retain the services of Martin Reiser. In the past three month period, Reiser has been selling 'Sandel' to the commercial health care industry." Forman likely hired Reiser at the Government's behest to further the success of Operation Extra Gold.

### B. Consultation

The Federal Circuit stated:

> We find the position adopted by the government is not supported by the plain language of the Agreement. On its face, paragraph 5 clearly does not require 'explicit' or 'specific' pre-approval; rather that Forman 'consult' with the FBI's designated representative as to the nature and justification for incurring expenses.... After consultation, if the FBI deemed the expenses 'not to be in furtherance of its investigative goals,' it could instruct Forman not to incur those expenses. Thus, if Forman consulted with the FBI regarding an expense, Forman would be responsible for that expense if the FBI directed him not to incur it.

*Forman*, 329 F.3d at 843.

To "consult" means to "take counsel together, deliberate, confer ...." *Oxford English Dictionary*, 799 (2d ed.1989). The Government argued at trial that the contract requires that plaintiff have express approval from FBI agents before incurring any expenses. The Federal Circuit opinion does not permit such an interpretation. *See, e.g., Forman*, 329 F.3d at 843 (stating that "paragraph 5 clearly does not require 'explicit' or 'specific' pre-approval."). Forman "conferred" with FBI agents about retaining Forman. No one from the FBI told Forman not to hire Reiser.

Evidence produced during trial included a faxed copy of the October 20, 1989 agreement between Forman and Reiser. The cover page of the fax from Forman to Reiser states, "Dear Marty, enclosed is a final draft of our Letter of Agreement.... We are about to type the final version and would like to send it to you today." A handwritten note in the corner of the fax is addressed to an FBI undercover agent: "Kevin-we are faxing this to Marty Reiser now. [signed] Wally [Wallace Forman]." An agreement attached to the fax describes Reiser's commission arrangement and other details of his employment.

Reiser eventually began to push for a weekly stipend of $600. Forman testified that the FBI was aware of this stipend. Reiser asked an undercover agent on one occasion to tell Forman that Reiser needed his checks sent weekly, instead of monthly as their agreement provided. Reiser made such requests on several occasions, and the undercover agent passed the messages to Forman. The agent did not tell Reiser to stop calling him about the checks or direct Forman not to pay them if he expected reimbursement.

Other evidence that the FBI knew about Reiser's compensation includes (1) a handwritten memorandum from a special agent stating that "[Forman] recently sent [Reiser] his first check totaling $3,000.00 which covers the last 5 weeks at $600/per wk.," (2) a December 10, 1990 memo from a special agent noted that "[Forman] is still paying [Reiser] $600/wk.," and (3) a January 5, 1991 memo stating, "[Forman] will put Reiser on a monthly salary, rather than the present weekly payment."

These documents demonstrate that the FBI knew about plaintiff's arrangements with Reiser. FBI agents included the information in their reports to headquarters. No one from the FBI instructed Forman that hiring Martin Reiser would not further the investigation. In fact, the FBI was aware that Reiser had an important role in the undercover operation. If Forman had not hired Reiser, targets of the investigation may have been suspicious, as Reiser evidently was their "inside man."

## CONCLUSION

The decision to hire Martin Reiser did not originate with Forman. Targets of the investigation wanted Forman to hire Reiser, and undercover FBI agents delivered this information to Forman. The FBI knew of Forman's arrangements with Reiser, and it did not advise Forman that Reiser's employment would not be in furtherance of the investigation. FBI agents did not advise Forman that he would not be reimbursed for Reiser's salary. It is reasonable to conclude therefore, based on the Federal Circuit's ruling, that Reiser's employment was necessary for the success of Operation Extra Gold.

The total of Forman's payments to Reiser in salary and miscellaneous expenses is not in dispute. The Clerk will enter judgment for plaintiff in the amount of $33,051.43, plus interest at the statutory rate. No costs.