NAPLESYACHT.COM, INC., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 04–252C.

United States Court of Federal Claims.

Filed April 26, 2004 *.

Opinion Originally Filed Under
Seal on April 14, 2004.

Order Denying Partial Reconsideration
May 11, 2004.

---

* This Memorandum Opinion was filed under seal on April 14, 2004. Thereafter, the court requested that the parties designate any text that they considered to be subject to a Protective Order, entered in this case on March 9, 2004, so that any protected information could be deleted from the public version of the Memorandum Opinion. Brackets in bold herein denote where such text has been deleted at the request of the parties and/or the court.

Jeffrey Isaac Gdanski, Gdanski & Gdanski, Teaneck, New Jersey, for plaintiff.

Claudia Burke, United States Department of Justice, Washington, D.C., for defendant. Andre Long, Associate Counsel, Naval Air Warfare Center, Weapons Division.

## MEMORANDUM OPINION AND FINAL JUDGMENT

BRADEN, Judge.

■ This bid protest case was filed by Naplesyacht.com, Inc. ("Naplesyacht.com" or

"Plaintiff"), to contest the Department of the Navy's ("Navy") award of two contracts for the construction and demonstration of Fast Attack Craft Target ("FACT") boats. The Contracting Officer for the Naval Air Warfare Center Weapons Division ("CO"), responsible for these contracts, informed the court that he has "unlimited procurement authority." March 25, 2004 Declaration of Nathan Simpson ("Decl.Simpson") at ¶ 1. The United States Court of Appeals for the Federal Circuit in *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1338 (Fed.Cir.2002), recognized that an agency's actions, such as those of the CO in this case, are entitled to a presumption of regularity, but that presumption may be rebutted where there has been an abuse of discretion, as occurred here. As a matter of law, no CO has "unlimited procurement authority," as that authority is subject to judicial review. *See* 5 U.S.C. § 706.

Although the court has determined that the Navy abused its discretion in rating the awardees for these contracts acceptable, on a technical basis and in other respects, the court has declined to issue a preliminary or permanent injunction to require the Navy to set aside the contracts for resolicitation. Nevertheless, the court finds the circumstances surrounding the issuance of these contracts to be of concern not only because the integrity of the procurement process was compromised, but also because the superficial manner in which due diligence was conducted raises questions about national defense and national security concerns that merit further inquiry.

### FACTS [1]

#### A. The Solicitation, Offer And Award.

On October 8, 2003, the Navy issued Solicitation, Offer and Award No. N68936–03–R–

---

1. The relevant facts recited herein were derived primarily from the March 5, 2004 Administrative Record ("AR"). In addition, other references herein are made to: Plaintiff's February 26, 2004 Complaint ("Compl."); Plaintiff's February 26, 2004 Motion for Preliminary Injunction ("Pl.Mot.Prelim.Inj."); Fifteen Exhibits to Plaintiff's Memorandum of Law in Support of a Pre-

liminary Injunction ("Pl.Ex."); the United States' ("the Government") March 12, 2004 Motion for Judgment Upon the Agency Record ("Gov. Mot. on Record"); the Government's March 12, 2004 Opposition to Plaintiff's Motion for Preliminary Injunction ("Gov.Opp."); Plaintiff's March 17, 2004 Cross–Motion for Summary Judgment Upon the Administrative Record and

0097 to procure one or more boats "to conduct a concept demonstration of a FACT." AR at 30, 33. The Solicitation provides that the "*boat offered* must be a close derivative of a commercial boat currently in production ... For the purposes of this solicitation, 'production' is defined as having *produced and delivered two or more boats of the same hull form within the last 18 months.*" AR at 33 (emphasis added). The specifications for the FACT required it to "*be a minimum of 50 feet in length* and must be capable of sustained speeds in excess of 50 knots in fully-developed sea state two (10 knot wind with 2 to 3 foot seas)." AR at 33 (emphasis added). In addition, the Navy informed the offerors that they "shall fabricate the FACT utilizing a *commercially available hull mold currently in production by the builder.* The intent is to utilize a variant of the commercial hull rather than develop a new hull form." AR at 34 (emphasis added).

## B. Evaluation Factors.

The Navy informed all offerors that the specific "Evaluation Factors and Criteria for Award" were:

1. Acceptability
2. Relevant Experience
3. Past Performance
4. Price

AR at 61.

The evaluation process was divided into two stages. First, bidders would be screened for acceptability regarding the technical factors set forth in the specifications on a "pass or fail basis." AR at 61. Second, all technically "acceptable" bidders then would be evaluated on "best value," based on the other evaluation factors, with price assigned a weight of 50%. This process was set forth in the Solicitation in detail:

> The government will perform a trade-off process taking into consideration the price and non-price factors listed ... and award a contract to the responsible offeror whose proposal represents the "best value" to the

government. *Acceptability will be evaluated on a pass or fail basis. Proposals, in order to be determined acceptable, must demonstrate that they meet the governments' [sic] minimum requirements set forth in the solicitation, including the specifications, and must propose what the government considers to be reasonable goals for small disadvantaged business participation in performance of the contract. Proposal will ultimately be rated either acceptable or unacceptable. Once the determination of acceptability is made this factor will no longer be relevant in any best value decision between price and non-price factors.* Acceptable proposals will be evaluated to determine the best value to the government considering Relevant Experience, Past Performance, and Price. *Price is approximately equal to the combination of Relevant Experience and Past Performance, which are of equal value, in determining which technically acceptable proposal offers the best value to the government. The government may be willing to pay a higher price for evaluated superior Relevant Experience and/or Past Performance,* although an offeror will not be selected for award merely because it demonstrates superior Relevant Experience and/or Past Performance as superiority in these two factors may or may not be deemed affordable or worth an additional amount of money depending upon what is most advantageous to the government. Considering that only technically acceptable proposals will be considered in the trade-off analysis described above, non-price factors are approximately equal in importance to price in determining the best value to the government.

AR at 61 (emphasis added).

### 1. Acceptability–Technical Factor.

The specifications of the Solicitation required that the FACT "be a minimum of 50 feet in length[.]" AR at 33. In addition, bidders were advised that "the technical proposal shall be evaluated as to whether it

Opposition to the Government's Motion for Summary Judgment Upon the Agency Record ("Pl. Mot.S.J."); the transcript of the March 3, 2004 telephone status conference ("TR–I"); the transcript of the March 18, 2004 oral argument ("TR–II"); and the transcript of a March 24, 2004 telephone status conference ("TR–III").

demonstrates that the *boat proposed is the manufacturer's current designed and available boat or a boat that has been slightly modified to fit the proposed system.*" AR at 61 (emphasis added). In making the acceptability evaluation, "[a]n offeror's technical proposal will be evaluated as to whether it clearly demonstrates the offeror's ability to meet *all of the requirements set forth* in Section C, **Specification for Fast Attack Craft Target (FACT).**" AR at 61 (bold in original) (emphasis added).

The Navy warned all offerors that "[t]he failure of an offeror's proposal to meet *any given* requirement of the solicitation may result in the entire proposal being found to be unacceptable and thus eliminated from the competition.... [technical a]cceptability will be evaluated on a pass or fail basis. Proposals, in order to be determined acceptable, *must* demonstrate that they meet the governments' [sic] minimum requirements set forth in the solicitation, including the specifications[.]" AR at 61 (emphasis added). The Navy further emphasized that: "*Taking any exceptions to the Solicitation,* including the Specification, may cause an offeror to be evaluated as unacceptable." *See* AR at 61 (emphasis added).

### 2. Price.

If an offer was rated as "acceptable" on a technical basis, price was the next most important evaluation factor. *See* AR at 61. The Navy advised that the offeror's proposed Total Price for all CLINs ("Contract Line Items") and SubCLINs ("Subcontract Line Items") would be added together and evaluated for "reasonableness and realism." AR at 62. Of particular significance to the dispute in this case, is the fact that the Navy recognized the linkage between the price and technical requirements:

An unrealistic price may be determined by the government to reflect that the offeror does not understand the requirement and *cause the technical proposal to be determined Unacceptable.*

AR at 62.

### 3. Relevant Experience.

To meet the Relevant Experience factor, the Navy instructed all bidders that they would be "evaluated on the depth and breadth of their recent specialized experience in manufacturing Magnetron Modulators as set forth in Section C, **Specification for Fast Attack Craft Target (FACT).**" AR at 62 (bold in original).

### 4. Past Performance.

The Navy also represented that past performance would be evaluated:

on [a bidder's] performance *under existing and prior contracts* for the same or similar products with similar dollar values. The government will give more consideration, and a lower risk assessment rating, to information that demonstrates quality of performance for the same or similar products with similar dollar values relative to the procurement under consideration for a Fast Attack Craft Target.... *The Government will consider both corporate and key individual past performance history. If an offeror ... [does] not have a past performance history relevant to this solicitation, that is, for the same or similar items with similar dollar values, the offeror will not be evaluated favorably or unfavorably on this factor.*

AR at 62 (emphasis added). In effect, an offeror with no prior relevant experience under this provision should receive no rating in this category. On the other hand, if an offeror has "past performance" experience, the following additional factors would be considered:

*Quality of product or service:* Ability to comply with contract requirements, accuracy of reports, a history of technical excellence, and appropriateness of personnel.
*Cost control:* Ability to complete projects within budget, provide current accurate and complete billings, engender cost efficiencies, and minimal change orders.
*Timeliness of performance:* Ability to meet milestones, reliability, responsiveness to technical direction, complete contracts on time including contract administration, and no liquidated damages assessed.
*Business relations:* Ability to effectively manage projects, effective management of Small/Small Disadvantaged Subcontracting and Women Owned Small Business Programs which meets or exceeds planned

goals, reasonable and cooperative behavior, effective notification and recommended solutions for emergent technical problems, business-like concern for the Government's interests.

*Customer satisfaction:* Ability to provide services and products which meet or exceed the end user's minimal performance requirements.

The evaluation will also consider receipt of widely recognized quality awards or certifications.

The rating of an Offerors Past Performance will be expressed as a risk assessment.

AR at 62.

## C. The Competitive Award Panel Review And Award Of The Contracts.

Eight initial proposals from seven companies were received by the Navy on or before November 13, 2003. *Compare* AR at 30 *with* AR at 68. Two of the proposals were submitted by the plaintiff, an authorized dealer of Nor–Tech products, with a "history of doing business with the Federal Government supplying Nor–Tech boats." Compl. at ¶ 5. All of the offers initially submitted were determined by the Navy to be technically deficient. *See* AR at 599. The primary reason for technical unacceptability was because "they did not demonstrate whether there [sic] proposed boat is based on their current production model, all were considered to be eligible for award if they could meet the production requirement of the Specification." AR at 484.

| Offeror | Technical Rating | Experience Risk | Performance Risk | Proposal Price | Competitive Range |
|---|---|---|---|---|---|
| American Marine Holdings, Inc. | Unacceptable | [] | [] | [] | Yes |
| Maximum Thunder | Unacceptable | [] | [] | [] | Yes |
| Nor-Tech (Alternate) [Naplesyacht.com] | Unacceptable | [] | [] | [] | No |
| Nor-Tech (Primary) [Naplesyacht.com] | Unacceptable | [] | [] | [] | Yes |
| Willard Marine, Inc. | Unacceptable | [] | [] | [] | Yes |
| Silver Ships, Inc. | Unacceptable | [] | [] | [] | Yes |
| United States Marine, Inc. | Unacceptable | [] | [] | [] | No |
| All American Marine Holdings, Inc. | Unacceptable | [] | [] | [] | No |

AR at 599.

After receiving the initial proposals, "discussions were held [by the Navy] to inform the offerors in the competitive range of the proposal deficiencies and a time frame to submit proposal revisions." AR at 599. The Government argues that "the agency did not hold discussions upon the issue of length." Gov. Mot. on Record at 14. In any event, only five companies submitted revised proposals on December 16, 2003. *See* AR at 599. Of the remaining five, three prices remained the same, while the two highest bidders reduced their prices.

| Offeror | Technical Rating | Experience Risk | Performance Risk | Revised Price |
|---|---|---|---|---|
| American Marine Holdings, Inc. | [] | [] | [] | [] |
| Maximum Thunder | [] | [] | [] | [] |
| Nor-Tech (Primary) [Naplesyacht.com] | [] | [] | [] | [] |
| Willard Marine, Inc. | [] | [] | [] | [] |
| Silver Ships, Inc. | [] | [] | [] | [] |

AR at 599.

On December 22, 2003, after evaluating the revised proposals, the Competitive Award Panel ("CAP")[2] recommended that American Marine Holdings, Inc. ("American Marine") and Maximum Thunder, Inc. ("Maximum Thunder") be awarded the contracts. *See* AR at 601–02; *see also* TR–II at 63–64. On the same day, after considering the evaluation factors and CAP's recommendation, the CO, on behalf of the Source Selection Authority, found that American Marine and Maximum Thunder's proposals were "fair and reasonable, and [provided] the best value to the Government." AR at 605. On December 23, 2003, the contracts were awarded to American Marine and Maximum Thunder. *See* AR at 608–09. The contracts are to be completed by August 19, 2004. *See* AR at 38.[3]

## PROCEDURAL BACKGROUND

On January 9, 2004, plaintiff filed a bid protest at the General Accounting Office ("GAO"). *See* AR at 1. On February 18, 2004, plaintiff withdrew that protest. *See* AR at 655. On February 26, 2004, plaintiff filed under seal a Motion for a Preliminary Injunction Requiring the Agency to Issue a Stay of Performance, together with 15 supporting exhibits, in the United States Court of Federal Claims. On February 27, 2004, the court convened a preliminary status and scheduling telephone conference with the parties. On March 3, 2004, the court convened a second telephone conference with

the parties to set a date for oral argument and a final briefing schedule. *See* TR–I. Counsel representing awardees, American Marine and Maximum Thunder, also participated in that conference. TR–I at 14–16.

On March 9, 2004, the court entered a Protective Order at the request of the parties. On March 12, 2004, the Government filed a Motion for Judgment Upon the Agency Record and Opposition to Plaintiff's Motion for a Preliminary Injunction under seal. On March 16, 2004, plaintiff filed an Opposition to the Government's March 12, 2004 Motion for Judgment Upon the Agency Record and a Cross–Motion for Judgment Upon the Administrative Record under seal.

On March 18, 2004, a non-public oral argument was held in Washington, D.C. *See* TR–II. At the conclusion of the argument, at the court's request, the parties agreed to explore a potential settlement of this matter. *See* TR–II at 71–75. On March 24, 2004, the court convened another telephone status conference to ascertain the prognosis for settlement. *See* TR–III. On March 26, 2004, the court was advised that the parties were unable to reach a settlement.

In light of the fact that the contracts at issue in this bid protest were awarded on December 23, 2003 and may be completed as early as June 2004, the court has determined the interest of justice is best served by resolving parties' respective motions for summary judgment on the administrative record. *See* RCFC 56.1.

---

**2.** The members of the CAP included: Mr. Nathan Simpson, Contracting Officer, Naval Warfare Weapons Center; Mr. Gary Trimble; a Contracting Specialist; *see* Gov. Mot. on Record at 3; Mr. Jeffrey Blume, Head of the Seaborne Targets Team, NAVAIR Weapons Division; and Mr. A. Ray Bethell. *See* AR at 602.

**3.** On March 3, 2004, counsel for American Marine and Maximum Thunder represented to the court that the contracts were approximately one-third complete and would be completed in June 2004. See TR–I at 15.

## DISCUSSION

### A. Jurisdiction.

The United States Court of Federal Claims has jurisdiction to review post-award bid protests, pursuant to the Tucker Act. *See* 28 U.S.C. § 1491(b)(1)-(4), as amended by the Administrative Dispute Resolution Act of 1996, Pub.L. No. 104-320, § 12, 110 Stat. 3870, 3874-76 (1996).

### B. Issues Regarding Standing.

#### 1. Plaintiff Has Established That It Has Been Prejudiced.

■ The United States Court of Appeals for the Federal Circuit in bid protest cases requires that "because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits." *Information Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed.Cir. 2003); *see also National Fed'n of Fed. Employees v. Cheney*, 883 F.2d 1038, 1053 (D.C.Cir.1989) ("Not every bidder in a solicitation may assert disappointed bidder standing, otherwise nuisance suits could handicap the procurement system."). To establish prejudice, a plaintiff must show that "absent the error, 'there was a substantial chance it would have received the contract award.'" *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1086 (Fed.Cir.2001) (quoting *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed.Cir. 1999)); *see also Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed.Cir.1996) ("To establish competitive prejudice, a protestor must demonstrate that but for the alleged error, there was a *substantial chance* that [it] would receive an award—that it was within the zone of active consideration.") (citations omitted).

■ As the revised proposals indicate, plaintiff was the third "offeror" with an acceptable technical rating and [ ] risk rating based on experience and past performance. *See* AR at 599. Although there was a[ ] difference between plaintiff's offer and Maximum Thunder's offer, the Solicitation explained that: "The government may be willing to pay a higher price for evaluated superior Relevant Experience and/or Past Performance[.]" AR at 61. In addition, the CAP was advised that "American Marine ... compares to [plaintiff], *the next offeror in line for an award,* who was rated acceptable, with Very Low [E]xperience Risk, Very Low Performance Risk, and a Price of [ ]." AR at 596 (emphasis added). Therefore, by the Navy's admission, plaintiff has established prejudice as the "next offeror in line for an award" with "a substantial chance" to receive one of the contracts. *See Statistica, Inc.*, 102 F.3d at 1581.

#### 2. Plaintiff Has Established That It Is An "Interested Party" In This Case.

■ The protestor also must establish that it is "an interested party." 28 U.S.C. § 1491(b)(1); *cf.* 31 U.S.C. § 3551(2) (for purposes of review by the GAO an "interested party [is] an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract."). A two-part test has been used to determine whether a protestor may be deemed an "interested party": 1) the protestor must show a connection to the procurement; and 2) the protestor must have an economic interest in the procurement. *See American Fed'n Gov't Employees, AFL–CIO v. United States*, 258 F.3d 1294, 1302 (Fed.Cir.2001) ("We hold that standing under § 1491(b)(1) is limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract.").

■ In this case, plaintiff has demonstrated that it is an interested party in two ways. First, plaintiff lost the economic opportunity of being awarded one of the contracts with a value of approximately [ ]. *See* TR–I at 15; *see also* Decl. Simpson ¶ 2 at 1; February 24, 2004 Declaration of Charles O. Wainright, III ("Decl.Wainright") at ¶ 12 at 3 (Pl.Ex. 2). In addition, plaintiff lost the opportunity to demonstrate that it could satisfactorily manufacture a FACT target boat for the Navy, which likely would be a "Relevant Experience" or "Past Performance" factor in the

event the Navy decides to procure FACT target boats in the future. *See* AR at 61–62; Decl. Wainright at ¶¶ 7–8 at 2, 12 at 3 (Pl.Ex. 2).[4]

## C. Standard Of Review.

### 1. In Bid Protest Cases.

Bid protest actions are reviewed under the standards of the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.* ("APA"), that provides:

The reviewing court shall—... (2) hold unlawful and set aside agency action, findings, and conclusions found to be—... (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; ... (D) without observance of procedure required by law[.]

5 U.S.C. § 706; *see also Impresa,* 238 F.3d at 1332 (holding that a bid award may be set aside if either: "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.").

■ In deciding whether a procurement official's decision lacks a "rational basis," the court's inquiry should determine whether "the contracting agency provided a coherent and reasonable explanation for its exercise of discretion." *Impresa,* 238 F.3d at 1332–33; *see also Marsh v. Oregon Natural Res. Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) ("[I]n making the

factual inquiry concerning whether an agency decision was 'arbitrary or capricious,' the reviewing court 'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' This inquiry must 'be searching and careful,' but 'the ultimate standard of review is a narrow one.'") (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 419, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)); *Grumman Data Systems Corp. v. Widnall,* 15 F.3d 1044, 1046 (Fed.Cir.1994) (recognizing that "Government agencies are entrusted with a good deal of discretion in making procurement decisions.").

■ In the alternative, to prevail on a challenge that the procurement procedure involved a violation of regulation or procedure, the plaintiff must "show a clear and prejudicial violation of applicable statutes or regulations." *Impresa,* 238 F.3d at 1333 (quoting *Kentron Hawaii Ltd. v. Warner,* 480 F.2d 1166, 1169 (D.C.Cir.1973)). Again, "[d]espite the wide discretion afforded to procuring agencies in selecting a bid, all submitted proposals must be evaluated consistent with ... the standards set forth in the RFP[.]" *Widnall,* 15 F.3d at 1047; *see also Andersen Consulting v. United States,* 959 F.2d 929, 935 (Fed.Cir.1992) (affirming holding in prior case requiring adherence to solicitation requirements) (citing *Data Gen. Corp. v. United States,* 915 F.2d 1544, 1551 (Fed.

---

4. Whether the Navy intends to purchase additional FACT target boats appears to be an issue. Plaintiff's CEO advised the court that Mr. Blume, Head of the Seaborne Targets Team of the NAVAIR Weapons Division, told the plaintiff that the Navy intends to purchase approximately 6 to 8 FACT target boats per year for the next twenty years and that the future purchases would be limited to the awardees of this solicitation. *See* Decl. Wainright at ¶¶ 7–8 at 2 (Pl.Ex. 2). Mr. Blume did not contest plaintiff's report about the Navy's future acquisition plans in his Declaration, *see* the March 10, 2004 Declaration of Jeffrey L. Blume, Head, Seaborne Targets Team, NAVAIR Weapons Division ("Decl.Blume"), although at oral argument the Government argued that even though this contract was important to national defense, the Navy had no current plans to purchase additional FACT target boats:

* * * * * *

THE COURT: We've had some discussion about whether the government plans to buy

any additional boats and you told me no. Is that correct?

MS. BURKE: That's correct. The government has no plans right now to do anything in the future. Whether they might decide later on—

THE COURT: How are they going to perfect their target practice? This is the only occasion in this century that they're going to perfect their target practice with [these] two boats?

MS. BURKE: As far as we know.

TR–II at 51–52; *but compare with* TR–II at 56 ("MS. BURKE: What I mean to say is that [the Navy] has no plans to do what the plaintiff has alleged ... which is to buy a whole slew of boats.").

Cir.1990)); *In re Universal Yacht Services, Inc.,* 2001 WL 360402 (Comp.Gen.).

■ When the parties dispute the meaning of a solicitation, the court must "begin with the plain language" of the solicitation and interpret it "in a manner that gives meaning to all of its provisions and makes sense." *McAbee Constr., Inc. v. United States,* 97 F.3d 1431, 1435 (Fed.Cir.1996). Thus, a solicitation, like a contract, "must be read in light of its purpose and consistently with common sense." *Stratos Mobile Networks USA, v. United States,* 213 F.3d 1375, 1380 (Fed.Cir.2000). If the solicitation provisions are clear and unambiguous, the court's inquiry is at an end and the plain and ordinary meaning of the provision controls. *See Forman v. United States,* 329 F.3d 837, 842 (Fed.Cir.2003).

## 2. On Summary Judgment Upon The Administrative Record.

As two of the most experienced members of the court in bid protest litigation have observed: "It is important to remember that the administrative record is not a documentary record maintained contemporaneously with the events or actions included in it. Rather, the administrative record is a convenient vehicle for bringing the decision of an administrative body before a reviewing agency or a court." *Tech Systems, Inc. v. United States,* 50 Fed.Cl. 216, 223 (2001) (Miller, J.); *see also Guam Indus. Services, Inc. v. United States,* No. 03–706, at 3 (Fed.Cl. June 9, 2003) (Baskir, J.) ("[T]he Administrative Record consists of the RFP and little more. The other material in the Administrative Record consists of background information and legal materials such as legislative and regulatory history commonly accepted in the adjudication of ordinary motions of summary judgment.").

Accordingly, the applicable standards to a Rule 56.1 motion differ from those applied in a Rule 56 motion for summary judgment: [T]he central inquiry on a motion for summary judgment—whether the movant has proved its case as a matter of fact and law or whether a genuine issue of material fact precludes summary judgment—has no bearing on a review of the administrative record in a bid protest. [Instead, the inquiry on a Rule 56.1 motion is] whether, given all the disputed and undisputed facts, a protestor has met its burden of proof that an award is arbitrary, capricious, [an abuse of discretion, or otherwise not in accordance with the law,] or violates to prejudicial effect an applicable procurement regulation.

*Tech Systems,* 50 Fed.Cl. at 222.

## 3. On Supplementation Of The Administrative Record.

Generally, a court reviewing an agency decision under the APA standard "should be the administrative record already in existence, not some new record made initially by the reviewing court." *See Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). For this reason, courts are extraordinarily skeptical about post-decision agency rationalizations. *See Citizens to Preserve Overton Park,* 401 U.S. at 419, 91 S.Ct. 814 ("These affidavits were merely 'post hoc' rationalizations, which have traditionally been found to be an inadequate basis for review. And they clearly do not constitute the 'whole record' compiled by the agency: the basis for review required by § 706 of the Administrative Procedure Act.") (internal citations omitted).

The United States Court of Appeals for the Federal Circuit has not addressed whether, or the circumstances under which, the administrative record may be supplemented. The United States Court of Appeals for the D.C. Circuit, however, has allowed the administrative record to be supplemented in the following situations:

(1) when agency action is not adequately explained in the record before the court; (2) when the agency failed to consider factors which are relevant to its final decision; (3) when an agency considered evidence which it failed to include in the record; (4) when a case is so complex that a court needs more evidence to enable it to understand the issues clearly; (5) in cases where evidence arising after the agency action shows whether the decision was correct or not; (6) in cases where agencies are sued for a failure to take action; (7) in cases

arising under the National Environmental Policy Act; and (8) in cases where relief is at issue, especially at the preliminary injunction stage.

*Esch v. Yeutter,* 876 F.2d 976, 991 (D.C.Cir. 1989) (quotations omitted).

Both parties have moved the court to supplement the administrative record. *See* Pl. Mot. S.J. at 8 n. 2 and the Government's March 30, 2004 Motion to Supplement the Administrative Record. For the reasons discussed herein, the court does not consider any of this supplemental information to be dispositive of the legal issues in this case, nevertheless, the court believes the interests of justice are best served with a full record. Therefore, the court grants both motions to supplement the record to include: the February 23, 2004 Declaration of Dr. Kenneth W. Fisher, President, Fisher Marine Consulting Group ("Decl.Fisher"); the February 24, 2004 Declaration of Charles O. Wainright, III, President, Napelsyacht.com, Inc. ("Decl.Wainwright"); the March 10, 2004 Declaration of Jeffrey L. Blume, Head, Seaborne Targets Team, NAVAIR Weapons Division ("Decl.Blume"); and the March 25, 2004 Declaration of Nathan Simpson, Contracting Officer, Naval Air Warfare Center Weapons Division ("Decl.Simpson").

### 4. For A Permanent Injunction.

The standard for a permanent injunction is the same as one for preliminary injunction, except the plaintiff must show actual success on the merits instead of a likelihood of success on the merits. *See Amoco Prod. Co. v. Village of Gambell, AK,* 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987). In addition, the plaintiff must show irreparable harm; the balance of the hardship favors the

plaintiff; and a "tolerable effect on the public interest." *Sofamor Danek Group, Inc. v. DePuy–Motech, Inc.,* 74 F.3d 1216, 1219 (Fed.Cir.1996); *see also FMC Corp. v. United States,* 3 F.3d 424, 427 (Fed.Cir.1993) (holding that no one factor is determinative, and "the weakness of one factor may be overborne by the strength of the others."). The party seeking an injunction bears the burden of proving entitlement to relief, central to which are success on the merits and irreparable harm. *See Sofamor Danek,* 74 F.3d at 1219 (citing *Reebok Int'l Ltd. v. J. Baker, Inc.,* 32 F.3d 1552, 1555–56 (Fed.Cir. 1994)).

### D. Resolution Of Pending Motions For Judgment On The Administrative Record.

**1. Plaintiff Has Established That The Navy Abused Its Discretion In Awarding Contract No. N68936–03–R–0097–Procurement Of Two FACT Target Boats.**

**a. The Navy Abused Its Discretion In Rating American Marine "Acceptable" On A Technical Basis.**

■ The Solicitation required that the "FACT [boat] will be a minimum of 50 feet in length[.]" AR at 33. The court has determined that the language of the Solicitation is clear—the Solicitation was to purchase a boat,[5] not a hull.[6] *See, e.g., McAbee Constr.,* 97 F.3d at 1435; TR–II at 33.[7] The length of the boat was to be a minimum of 50 feet; nothing less.

American Marine's offer was for a[ ]. AR at 136. Thus, American Marine recognized that its offer did not meet the technical requirements of the Solicitation: "Although we

---

**5.** The Dictionary of Nautical Word and Terms 51 (1992) defines a "boat" as a "small craft not normally suitable for sea passages but useful in sheltered waters and for short passages." The United States Coast Guard Regulations defines boat "length" as "the straight line horizontal measurement of the overall length from the foremost part of the boat to the aftermost part of the boat, measured from end to end over the deck excluding sheer, and measured parallel to the centerline." 33 C.F.R. § 183.3.

**6.** The Dictionary of Nautical Word and Terms 196 (1992) defines a "hull" as the "Body of a ship,

and excluding interior riggings." *See also* Merriam-Websters Collegiate Dictionary 563 (10th Ed.2001) (a "hull" is defined as "the frame or body of a ... boat exclusive of masts, yards, sails, and rigging" or "the main body of a [usually] large or heavy craft or vehicle (as an airship or tank)").

**7.** THE COURT: But you weren't buying a hull, you were buying a boat.

MS. BURKE: That's correct.

believe this hull in it's [sic] current design *could* provide for your requirements. Our approach to satisfying your overall length request will be to [ ]." AR at 136. Nevertheless, the Navy summarily concluded and represented to the CAP that American Marine was "rated Acceptable [on a technical basis]." AR at 601; *see also* AR at 593 ("The technical evaluation team verified the proposal was technically acceptable."); Decl. Blume at ¶ 6 (the "technical team *deems* a[ ].") (emphasis added).

▉ In this instance, the Navy took a number of actions that collectively evidence an abuse of discretion. First, the Navy solicited bids for the FACT boats based on a specific size criterion that the Navy abandoned and/or waived, despite providing extensive warnings to the offerors that strict adherence to the requirements in the Solicitation was mandatory. *See* AR at 33, 61; TR–II at 33.[8] *See also In re Universal Yacht Services, Inc.,* 2001 WL 360402, *3 ("It is well-settled that, in a negotiated procurement, a proposal that fails to conform to one or more of the solicitation's material requirements is technically unacceptable and cannot form the basis for an award.") (citing *Farmland Nat'l Beef,* 2001 WL 122348, *5 (Comp. Gen.)). The Solicitation, Offer and Award No. N68936–03–R–0097 was a negotiated procurement. *See* AR at 30.

▉ Second, the Navy found that all the initial offers to be "technically deficient," at which time the Navy knew or was satisfied that American Marine's [ ] boat would meet its needs. The Navy, however, did not advise the other offerors of this information, so they could consider, amend, or adjust their proposals, or not. In doing so, the Navy afforded American Marine preferential treatment and undermined the integrity of the procurement process because a[ ] boat likely would, and in fact did, cost less than a 50' foot boat to build. *See* AR at 599; *see also* Decl. Wainright ¶ 11 at 3 (Pl.Ex. 2). Moreover, the Navy showed no regard for the

time and resources expended by plaintiff and other offerors in a good faith effort to meet the specifications that the Navy represented that it required.

Third, the CAP minutes evidence there was no disclosure of the fact that American Marine did not submit an offer in compliance with the technical requirements set forth in the Solicitation nor was any "coherent and reasonable" explanation of why the Navy decided that a[ ] hull met its technical requirements. In sum, the Navy provided no "coherent and reasonable explanation of its exercise of discretion" to abandon or waive the size requirements specified in the Solicitation without informing all offerors of that decision. *See Impresa,* 238 F.3d at 1333; *In re Universal Yacht Services,* 2001 WL 360402, *3.

For these reasons, the court has determined that the Navy's rating of American Marine to be "Acceptable" on a technical basis was a clear error of judgment and an abuse of discretion.

**b. The Navy Abused Its Discretion In Rating Maximum Thunder "Acceptable" On A Technical Basis.**

▉ The Solicitation also required that an offer or must have "*produced and delivered* two or more *boats* of the same hull form within the last 18 months." AR at 33 (emphasis added). Maximum Thunder, however, never [ ]. *See* AR at 582–83. Instead, Maximum Thunder certified that [ ]. AR at 443. Recognizing that it did not meet the technical requirements of the Solicitation, Maximum Thunder proffered what information it could to demonstrate its technical ability, *i.e.,* it [ ]. AR at 446; *see also* TR–II at 33.

The record reflects that, despite the fact that Maximum Thunder had not [ ], a Navy evaluation team found Maximum Thunder's proposal "technically acceptable" and certified that Maximum Thunder was able to "fulfill the requirements as set forth in the original solicitation." AR at 593; *see also*

---

8. The Government argues that these warnings were merely "discretionary." Gov. Mot. on Record at 17. The Solicitation is to be read "in a manner that gives meaning to all of its provisions and makes [common] sense." *McAbee Constr.,* 97 F.3d at 1435. Accordingly, the court interprets the Navy warnings to offerors that they must adhere to the Solicitation requirements strictly—to mean what it said.

AR at 601. Again, the Navy did not inform the other offerors its decision to abandon or waive the prior experience portion of the technical requirements in the Solicitation. Here too, the minutes of the CAP meeting reflect that the Navy summarily concluded that Maximum Thunder's proposal was "Acceptable" on a technical basis, without any disclosure or explanation on the record of the fact that Maximum Thunder did not comply with the Solicitation requirements nor was any explanation proffered as to why that decision was made. *See* AR at 601–02. In addition, the CAP erroneously was advised that "Maximum Thunder has [ ]." AR at 601.

The Government contends that "[s]ince the hull form is the basis of this procurement, the Navy correctly and responsibly exercised its discretion to determine that [Maximum Thunder's proposal] satisfied the requirements of the solicitation." Gov. Mot. on Record at 18. That may be so, but having decided to abandon and/or waive the technical requirements set forth in the Solicitation, the Navy was obliged at least to advise all offerors of that decision, fully disclose the facts to the CAP, and provide a "coherent and reasonable" explanation of why its decision was rational. The court has determined that the Navy's conclusory, incomplete, and incorrect representation to the CAP was insufficient as a matter of law and its decision to rate Maximum Thunder acceptable on a technical basis was a "clear error of judgment" and an abuse of discretion. *See Impresa*, 238 F.3d at 1332–33; *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057–58 (Fed.Cir.2000); *In re*

9. Relevant to this protest is the fact that Maximum Thunder advised the Navy that its boat [ ]. AR at 443 (emphasis added). None of the other offerors' proposals referred to their boat size as [ ], therefore it would appear this is not a term typically used by the industry. For this reason and the proximity of American Marine and Maximum Thunder's price (and the fact neither changed their bids when their proposals were "revised"), a question arises as to whether Maximum Thunder had pre-bid knowledge of American Marine's proposal (and perhaps plaintiff's as well) and, if so, how it received that information. *See* 15 U.S.C. § 1; U.S. Department of Justice and Federal Trade Commission Horizontal Merger Guidelines § 2.1 (Revised April 8, 1997) (describing market factors "conducive to reaching

*Universal Yacht Services*, 2001 WL 360402, *3.[9]

\* \* \* \* \* \*

The Navy stated that: "Acceptability will be evaluated on a pass or fail basis. Proposals, in order to be determined acceptable, must demonstrate that they meet the governments' [sic] minimum requirements set forth in the solicitation … Proposals will ultimately be rated either acceptable or unacceptable. Once the determination of acceptability is made this factor will no longer be relevant in any best value decision between price and non-price factors." AR at 61. Since the Navy's decision to rate American Marine and Maximum Thunder "acceptable," on a technical basis, was an abuse of discretion, plaintiff met its burden of demonstrating success on the merits regarding this bid protest, however, for the reasons discussed in the continuation of this analysis, the court has declined to issue either a preliminary or permanent injunction in this case to set aside their contracts and require the Navy to have them resolicited.

### c. The Navy Did Not Abuse Its Discretion In Conducting The Price Analysis.

 The Solicitation also stated that once an offeror was rated as acceptable on a technical basis, price was designated as the most important factor, being assigned a weight of 50%, with relevant experience and past performance each being assigned a 25% weight. *See* AR at 61. In marked contrast to the conclusory and incomplete nature of the acceptability ratings, the Navy articulated in

terms of coordination" to include "the availability of key information concerning market conditions, transactions and individual competitors; the extent of firm and product heterogeneity; pricing on marketing practices typically employed by firms in the market; the characteristics of buyers and sellers; and the characteristics of typical transactions."); *see also* 41 U.S.C. § 423(h)(1) (The Procurement Integrity Act prohibits knowingly disclosure of "contractor bid or proposal information or source selection information.").

Accordingly, the court is providing the Antitrust Division of the Department of Justice with a copy of this Memorandum Opinion and Final Order, under seal, for a preliminary inquiry and such further action as it may deem appropriate.

detail its rationale for heavily weighing price in the decision to award contracts to American Marine and Maximum Thunder:

> American Marine was rated Acceptable [on a technical basis], with [ ]. This compares to [plaintiff], the next offeror in line for an award, who [sic] was rated acceptable, [ ] *current* proposal, their other experience *seems* to be in producing racing boats but the proposal doesn't specify the length. Therefore[,] their depth of experience for similar craft leaves some doubt that they will successfully perform the required effort. [Plaintiff] was rated as having [ ]. Both American Marine and [plaintiff] were rated as having [ ] as a result of the evaluation of Past Performance. The evaluations were based on responses to a questionnaire sent to points of contact provided by offerors for previous contracts performed. As [ ] for American Marine and [plaintiff], the trade-off decision is based on Price and Relevant Experience with Price being more important than Relevant Experience. [Plaintiff's] Price is [ ] than American Marine. While [plaintiff] is rated as having [ ], it is due primarily to American Marine not producing as many [ ] [plaintiff]. While, because of the [ ], there is increased risk of American Marine successfully performing the contract[,] as opposed to [plaintiff], it is not enough to warrant paying a[ ], especially since Price is more important than Relevant Experience. Therefore American Marine ... represents the best value to the government for award of one of the contracts.

AR at 601 (emphasis added).

> Maximum Thunder was rated Acceptable, with [ ], and a Price of [ ]. This compares to [plaintiff], the next offeror in line for an award, who was rated acceptable, with [ ], and a Price of [ ]. The award criteria above state in part "Once the determination of acceptability is made this factor will no longer be relevant in any best value decision between price and non-price factors. Acceptable proposals will be evaluated to determine the best value to the government considering Relevant Experience, Past Performance, and Price. Price is approximately equal to the combination of Relevant Experience and Past Performance, which are of equal value, in determining which technically acceptable proposal offers the best value to the government." [Maximum] Thunder, with a[ ] as [plaintiff], which was rated as having [ ]. Maximum Thunder has recently produced [ ]. Two meet all the other requirements of the specification as well. Experience is [ ]. [Plaintiff] was rated as having [ ]. Both Maximum Thunder and [plaintiff] were rated as having [ ] as a result of the evaluation of Past Performance. The evaluations were based on responses to a questionnaire sent to points of contact provided by offerors for previous contracts performed. [ ] for Maximum Thunder and [plaintiff], the trade-off decision is based on Price and Relevant Experience with Price being more important than Relevant Experience. [Plaintiff's] Price is [ ] than Maximum [Thunder]. While [plaintiff] is rated as having [ ], it is due primarily to Maximum Thunder having less depth of experience than [plaintiff] [ ] as [plaintiff]. While, because of the difference in experience, there is [ ] of Maximum Thunder successfully performing the contract as opposed to [plaintiff], it is not enough to warrant paying a[ ] price, especially since Price is more important than Relevant Experience. Therefore Maximum Thunder represents the best value to the government for award of one of the contracts.

AR at 601–02.

The Independent Government Estimate for each FACT target boat was [ ], "based on engineering estimates and market research." AR at 484. Plaintiff challenges the Navy's acceptance of American Marine's price of [ ] because it was based on a[ ]. Therefore, it appears that American Marine still would have received one of the contracts for the FACT. *See* AR at 599. Although the court's estimated calculation may not be completely accurate, plaintiff provided no evidence to demonstrate that its price would have been the lowest or second lowest, even if it submitted a proposal based on a[ ].

For these reasons, the court has determined that the Navy did not abuse its discre-

tion in conducting the price analysis.[10]

### d. The Navy Abused Its Discretion In Rating Maximum Thunder As A "Very Low Risk" For Past Performance.

 Maximum Thunder admitted that it [ ]. AR at 196. Nevertheless, the Navy assigned Maximum Thunder a rating of [ ], apparently based on one response to a questionnaire from a Gary Murphy who purchased two hulls from Maximum Thunder for $60,000 in March 2002. *See* AR at 582–90.

The Navy further concluded that Maximum Thunder was a "responsible" party because:

> Maximum Thunder is not listed on the Lists of Parties Excluded from Federal Procurement or Non–Procurement programs checked 11 December 2003. Maximum Thunder has been determined to be responsible in accordance with [FAR § 9.103(a) ].
>
> *The contractor has the adequate financial resources to perform the efforts, can comply with the performance schedule, has a satisfactory performance record, has a satisfactory record of integrity and business ethics, has the necessary organization experience, accounting and operational controls, and technical skills to perform the services under this contract.*

AR at 593 (emphasis added).

Prior to the premeditated and unjustified Act of War on this Nation on September 11, 2001, our court routinely afforded substantial deference to decisions made by federal agencies regarding procurement of products and services used by the military. Such deference was appropriate in accord with traditional notions of deference to agency expertise per *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) and its progeny. Whether such deference routinely should continue to be afforded in light of the duty of all government institutions to exercise heightened diligence regard-

ing national defense concerns does not need to be resolved today, because—in this case—Maximum Thunder had no [ ] and the Navy conducted no financial or other relevant due diligence, despite the above referenced conclusory statements to the contrary. Moreover, after pressing this issue, the court learned that in this time of national alert that such practice appears to be routine:

> MS. BURKE: It's my understanding that [Maximum Thunder is] privately held. We did a quick search on the website that indicates whether a company has been debarred. . . . the government cannot be expected to delve into the assets of each offeror.
>
> THE COURT: Well, that certainly raises an interesting question, doesn't it? We would be buying material from the Al Qaeda under that argument and that would be fine with you.
>
> MS. BURKE: Well, it's a matter of efficiency. The government, for example, leases—
>
> THE COURT: But the public interest covers [things] other than efficiency.

*See* TR–II at 38.

\* \* \* \* \* \*

> MS. BURKE: [Maximum Thunder] has adequate financial resources and can—
>
> THE COURT: How did they know that?
>
> MS. BURKE: Well, that's the decision of the agency. I mean, it's a conclusion.
>
> THE COURT: Right, I would like to see the underlying documents from the government.
>
> MS. BURKE: I'm not certain that there are underlying documents, but we can certainly look into it.
>
> THE COURT: This is just a conclusion, there is no written-somebody could sit down and write this based upon seeing nothing or they just made [up] this evaluation? Presumably they checked to see if [Maximum Thunder] had bank accounts, sufficient assets if they defaulted. There's got to be a report somewhere, I suspect.
>
> MS. BURKE: It's possible.

---

10. Plaintiff does not challenge the Navy's analysis of Maximum Thunder's price, which was [ ]

per foot. *See* AR at 599.

THE COURT: I would think so.

MS. BURKE: But it's not part of anything that—

THE COURT: Well, you'll report back to the Court as to whether or not there is such a document and, if there is not, you will report that as well and I'd like to see the document.

See TR–II at 50–51.

\* \* \* \* \* \*

THE COURT: And that is of interest to the Court, not only for this, but for other cases as well. I mean, it cannot be that the government is contracting with people merely because they don't show up on the FAR list as being disbarred. I mean, that could be an extraordinary dangerous set of circumstances.

MS. BURKE: But the fact is the government solicits each pen that it gets up to fighter aircraft.

THE COURT: Right.

MS. BURKE: This is 24 hour work that the government is doing. They are constantly evaluating—

THE COURT: But the standards for buying pens[,] one would think[,] are very much different than those used in ... presumably critical target practice ... It does trouble the Court[.] It cannot be that, at least in this type of an area, that we merely look to a list ... It seems to me that we have [to have] some process of knowing who we're doing business with, particularly at this time. I am very interested in seeing that documentation.

MS. BURKE: Okay. That's fine, Your Honor. If it exists—

THE COURT: Or an affidavit. If there isn't documentation, send in an affidavit from the person who did the analysis so I can find out what they did.

See TR–II 67–68.[11]

Rather than request a deposition of the CO, the court offered the Government a less intrusive option either to provide documents or an affidavit that would demonstrate: "1) whether the contracting officer, as required by 48 C.F.R. § 9.105–1(a), possessed or obtained information sufficient to decide the integrity and business ethics issue, including the issue of control, before making a determination of responsibility; and 2) on what basis he made the responsibility determination." *Impresa*, 238 F.3d at 1339. The Government made no such demonstration despite the court's request to do so. The court is mindful that an "agency's decision is entitled to a presumption of regularity." *Impresa*, 238 F.3d at 1338 (citing *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 626–27, 106 S.Ct. 2101, 90 L.Ed.2d 584 (1986)). In this case, however, that presumption is rebutted by the Government's abuse of discretion in finding Maximum Thunder acceptable on a technical basis and the Navy's admission that its due diligence was based on a "quick search on the website that indicates whether a company has been debarred," TR–II at 38, and that, in fact, the Navy made no meaningful inquiry into the "adequa[cy of Maximum Thunder's] financial resources ... record of integrity and business ethics, [and] account-

---

11. Plaintiff also argues that Maximum Thunder is not a "responsible party" and should not have been rated as a[] for Past Performance because that company is "impermissibly intertwined" with a different company that was owned by an individual serving time in prison [Thunder Power Boats, Inc. or Thunder Power]. *See* Pl. Mot. S.J. at 26; *see also* AR at 28 (2003 U.S. Coast Guard Manufacturing Identification Code re. Thunder Power Inc. with comment noted that "the owners are reported to be in prison."). This relationship arises from the transfer of certain assets from Robert Oetringer, the sole owner of Thunder Power, allegedly to avoid the seizure by law enforcement authorities, to Ms. Julie Brown, President of Maximum Thunder. *See* AR at 15–29. Plaintiff alleges without any substantiation that Mr. Oetringer was incarcerated for drug related charges in November 2001. *See* Pl. Mot. Prelim. Inj. ¶ 46 at 10. In addition, plaintiff further claims Ms. Brown was a Director of Mr. Oetringer's company and operated another firm, Maximum Power, Inc., out of a warehouse used by Mr. Oetringer and that those assets were transferred to Maximum Thunder. *Id.* at ¶ 48. Although plaintiff's independent due diligence certainly raises questions, the court has not considered any of these allegations in reaching a decision in this case because of the speculative and inconclusive nature of the evidence proffered.

In addition, plaintiff contends that Maximum Thunder []. Pl. Mot. S.J. at 24. The Solicitation does not require that the offeror actually own the hull mold that it uses to produce the FACT. Therefore, the ownership of the hull mold was irrelevant to the issue of whether Maximum Thunder was a responsible contractor.

ing and operational controls," although it represented otherwise on the public record. AR at 593. The court does not consider an unverified answer to a "questionnaire" from one customer, about whom the Navy made no inquiry, to satisfy the requirements of 48 C.F.R. § 9.105–1(a). In any event, under the requirements of the Solicitation, Maximum Thunder should have received no rating as to its past performance, rather than one with a[ ]. *See* AR at 62.

For these reasons, the court has determined that the Navy's decision to award Maximum Thunder with the [ ] to be a clear error of judgment and "an abuse of discretion." [12] *Advanced Data Concepts*, 216 F.3d at 1057–58; *In re Universal Yacht Services*, 2001 WL 360402, *3.

### 2. Plaintiff Has Not Established Irreparable Injury In This Case.

Plaintiff asserts that it has suffered irreparable harm because of the loss of opportunity to compete "on a level playing field for a contract[.]" *See* Pl. Mot. S.J. at 35. Loss of opportunity to compete for a contract on an equal basis has been considered sufficient by the court in other situations to sustain a finding of irreparable injury. *See International Res. Recovery, Inc. v. United States*, 60 Fed.Cl. 1, 6–7 (2004); *Gentex Corp. v. United States*, 58 Fed.Cl. 634, 654 (2003). Plaintiff also claims that it will be irreparably harmed if the contract is not permanently enjoined because it has no adequate remedy at law. *See* Pl. Mot. S.J. at 34–37.

For reasons discussed, however, herein, the court does not find that the quality of plaintiff's injury in this case to be irreparable and declines to grant injunctive relief. *See Sofamor Danek*, 74 F.3d at 1219 (a grant of injunctive relief is committed to the trial court's discretion). Plaintiff has lost approximately [ ], the profit it would have made on one boat. *See* Decl. Wainright at ¶ 12. Whether plaintiff ultimately will be harmed by being precluded from competing for the award of any further FACT target boats or whether the current awardees will be given preference because of the experience gained from being awarded the contracts at issue, is not known. See *Tenacre Found. v. I.N.S.*, 78 F.3d 693, 695 (D.C.Cir.1996) (to constitute irreparable harm, plaintiffs' alleged injury must be "certain and great, not theoretical"). The Navy represented to the court that in the future neither American Marine or Maximum Thunder will be given any preference and will be on equal footing with plaintiff, as well as other offerors, in the event that contracts for FACT target boats are issued in the future. The Court takes the Navy at its word.[13]

### 3. The Balancing Of Harm.

The Solicitation requires delivery of the FACT boats 240 days after the date of the

---

12. The plaintiff does not contest the Navy's past performance rating of American Marine.

13. THE COURT: It seems to me that part of the irreparable harm that is being argued here is ... really for the future opportunities that they feel they are going to be precluded from. And I've kind of been toying with some thoughts about a remedy there. You say that the Navy is not going to buy any more boats for target practice in the future, you don't think it will be, that is an extraordinary argument under the circumstances.

MS. BURKE: I apologize. What I meant to say is that they have no plans to do what the Plaintiff has alleged that they are going to do, which is buy a whole slew of boats for the same purpose and only use the awardees in this contract to buy those boats. There is no evidence of that.

THE COURT: Well, I'm trying to think of something that might work that would put them on equal footing so that the awardees are not going to get any points for having done these contracts in the sense there is any preference in terms of past experience.... the next time you award, if you use the same factors, [the awardees are] going to now qualify under two of those factors by the very fact that they've done this contract. And[,] if they were in fact awarded inappropriately, that doesn't seem fair.

MS. BURKE: The government takes very seriously the idea that incumbents have no preference in the process. The government takes very seriously that new contractors should be afforded an opportunity to compete, which is precisely why the language in the past performance section exists. Even if you have done nothing before, we don't take off points for it. There is nothing in the record or anywhere else that indicates the government has any intention to favor Maximum Thunder and American Marine if it chooses to have a new solicitation for a similar item. Nothing at all except the affidavit that the Plaintiff has submitted[.]

TR–II at 56–58.

contract award, *i.e.,* by August 19, 2004. *See* AR at 38. On March 3, 2004, the court was advised that both awardees had completed approximately one-third of the contract. TR–I at 15. In light of the dollar amount involved in these contracts and the fact that the contract is close to being substantially performed, the court discerns no compelling reason to enjoin the Navy from completing these two contracts and mandating that they be rebid. *See Parcel 49C Ltd. P'ship v. United States,* 31 F.3d 1147, 1154 (Fed.Cir. 1994) ("Resolicitation would only result in further, unnecessary expenditures of Government resources ... [and interfere] with the Government's discretion to select its own contractors.").

### 4. Effect On The Public Interest.

#### a. The Integrity Of The Procurement Process Was Compromised In This Case.

Our appellate court has stated, "We recognize the importance of ensuring that the public's faith in the integrity of the procurement process is not compromised[.]" *Central Arkansas Maint., Inc. v. United States,* 68 F.3d 1338, 1343 (Fed.Cir.1995) (Mayer, C. J.); *see also C.A.C.I., Inc.-Fed. v. United States,* 719 F.2d 1567, 1573 (Fed.Cir.1983) (quoting *United States v. John C. Grimberg Co.,* 702 F.2d 1362, 1367 (Fed.Cir.1983)) (holding that Tucker Act jurisdiction is founded on "an implied contract to have the involved bids fairly and honestly considered."); *Meister Bros., Inc. v. Macy,* 674 F.2d 1174, 1177 (7th Cir.1982) (quoting *United States v. Wharton,* 514 F.2d 406, 412–13 (9th Cir.1975)) ("[The] public has an interest in seeing its government deal ... fairly with its citizens.").

In this case, the court is persuaded that the Navy did not consider the bids "fairly" in

that the Navy knowingly abandoned or waived specific technical requirements set forth in the Solicitation as a threshold criteria. The court does not consider that decision to be an abuse of discretion that could not immediately be remedied by disclosing that information to all offerors, before the second round of offers was accepted, and fully disclosing on the public record the fact of the change and the Navy's rationale in the CAP process. By failing to undertake these minimal actions, the Navy compromised the integrity of the procurement process in this case.

#### b. National Defense and National Security Considerations.

The Tucker Act, specifically, requires the court to take national defense and national security into account in ruling on bid protest actions. *See* 28 U.S.C. § 1491(b)(3). The Government attempted to argue that national security is at stake here because the contract involves supplying moving target practice for Navy aircraft. *See* TR–II at 43–45,[14] 51–52; *see also CSE Constr. Co., Inc. v. Untied States,* 58 Fed.Cl. 230, 262–63 (2003) (finding a contract regarding firing range renovations at an Army base to implicate national security as the renovations were for training soldiers according to modern standards).

Clearly, our Navy pilots are not dependent upon the procurement of these two FACT target boats to obtain the appropriate training. In fact, the Navy likely could purchase new or used 50′ boats commercially that could serve much the same purpose as the FACT target boats at issue in this case. The court does not question the Navy's decision to procure these boats, but if national security was an important factor, the court would have expected the Navy to have procured these boats in a more confidential manner

---

14. MS. BURKE: Your Honor has indicated that this doesn't seem like an important contract, the Navy is in the Persian Gulf, the Navy is fighting a war. The fact that they are trying to develop technology-

THE COURT: I wouldn't stick to that argument much, if I were you....The success of the government in the Persian Gulf is not going to depend upon these two boats being put together and blown up.

MS. BURKE: No, however, the Navy needs to perfect its target practice and how else are they going to do it? This is how they do it.

THE COURT: I suspect that they figured out how to do it before this time when they didn't have the boats.

TR–II at 45.

and conducted its due diligence with a substantial amount of more rigor than was done in this case. In that regard, the court would hope that the Navy will reconsider its standard operating procedures for conducting due diligence in similar cases in the future, which in the undersigned judge's opinion, has room for improvement.

### E. Remedy.

Plaintiff has requested bid and proposal expenses, including costs and attorney's fees associated with this protest. *See* Compl. at 16. Under the Tucker Act, the court may award monetary relief in post-award bid protests on "bid preparation and proposal costs." 28 U.S.C. § 1491(b)(2); *see also* 28 U.S.C. § 1920; *E.W. Bliss Co. v. United States*, 77 F.3d 445, 447 (Fed.Cir.1996). Accordingly, plaintiff may file an appropriate motion and supporting documentation to recover its bid preparation and proposal costs. In addition, the plaintiff may move for an award of attorney fees and expenses under the Equal Access to Justice Act, if it meets the threshold requirements of that Act. *See* 28 U.S.C. § 2412(b).

Although the court has determined that injunctive relief in this case is inappropriate, in the event that the Navy decides to issue a Solicitation for additional FACT Navy target boats in the future, plaintiff and the other offerors for Contract No. N68936–03–R–0097 will be notified of such Solicitation and be offered a timely opportunity to submit a proposal and offer. The Navy will not afford either American Marine, Maximum Thunder, nor any entity with which either company has or has had an economic or business relationship, any preference or advantage for having been selected under Contract No. N68936–03–R–0097. *See Southfork Systems, Inc. v. United States*, 141 F.3d 1124 (Fed.Cir. 1998) (If the Government breaches its implied contract to consider bids fairly and honestly, then the United States Court of Federal Claims also "has the power to award equitable relief."). In the event that plaintiff or any other offeror for Contract No. N68936–03–R–0097 files a bid protest or action regarding any such future contract regarding FACT target boats in the United States Court of Federal Claims, the case should be filed pursuant to RCFC 40.2 and the Clerk of the Court be informed of the same.

### CONCLUSION

For the aforegoing reasons, plaintiff's February 26, 2004 Motion for a Preliminary Injunction is denied; the Government's March 12, 2004 Motion for Judgment Upon the Agency Record is denied; and plaintiff's March 12, 2004 Cross–Motion for Judgment Upon the Administrative Record is granted in part and denied in part. Plaintiff's request for preliminary and/or permanent injunctive relief is denied.

Plaintiff may move for bid preparation and proposal costs, pursuant to 28 U.S.C. § 1491(b)(2), and for other costs, pursuant to 28 U.S.C. § 1920. In addition, plaintiff may move for an award of attorneys fees and expenses under the Equal Access to Justice Act, 28 U.S.C. § 2412(b).

In the event that the Navy decides to issue a Solicitation for additional FACT Navy target boats in the future, plaintiff and the other offerors for Contract No. N68936–03–R–0097 will be notified of such Solicitation and be offered a timely opportunity to submit a proposal and offer. The Navy will not afford either American Marine, Maximum Thunder, nor any entity with which either company has or has had an economic or business relationship, any preference or advantage for having been selected under Contract No. N68936–03–R–0097. In the event that plaintiff or any other offeror under Contract No. N68936–03–R–0097 files a bid protest or action regarding any such future contract regarding FACT target boats in the United States Court of Federal Claims, the case should be filed pursuant to RCFC 40.2 and the Clerk of the Court be informed of the same.

In addition, the parties should advise the court by April 23, 2004 as to which portions of this Memorandum Opinion and Final Judgment, in the interest of justice, are still required to be placed under seal.

Once the redacted Memorandum Opinion and Final Judgment is released, the Clerk of

the Court will mail a copy of same to the parties and all other offerors that submitted offers and proposals for Contract No. N68936–03–R–0097.

**IT IS SO ORDERED.**

## ORDER DENYING MOTION FOR PARTIAL RECONSIDERATION

On April 26, 2004, the court issued a Memorandum Opinion and Final Judgment denying: plaintiff's February 26, 2004 Motion for a Preliminary Injunction; and defendant's ("Government") March 12, 2004 Motion for Judgment Upon the Agency Record. The court also granted-in-part and denied-in-part plaintiff's March 12, 2004 Cross–Motion for Judgment Upon the Administrative Record. In addition, plaintiff also was afforded the opportunity to move for bid preparation and proposal costs, as well as other costs and attorneys fees and expenses.

On April 27, 2004, the Government moved for partial reconsideration regarding the following language in the court's April 26, 2004 Memorandum Opinion and Final Judgment:

> in the event that the Navy decides to issue a Solicitation for additional FACT Navy target boats in the future, plaintiff and the other offerors for Contract No. N68936–03–R–0097 will be notified of such Solicitation and be offered a timely opportunity to submit a proposal and offer. The Navy will not afford either American Marine, Maximum Thunder, nor any entity with which either company has or has had an economic or business relationship, and [sic] preference or advantage for having been selected under Contract No. N68936–03–R–0097. In the event that plaintiff or any other offeror under Contract No. N68936–03–R–0097 files a bid protest or action regarding any such future contract regarding FACT target boats in the United States Court of Federal Claims, the case should be filed pursuant to RCFC 40.2 and the Clerk of the Court be informed of the same.

Gov't Mot. to Reconsider at 2 (quoting *Naplesyacht.com, Inc. v. United States*, 60 Fed. Cl. 459, 478, 2004 WL 905412, *17 (Fed.Cl. April 26, 2004)).

The Government argues that the aforementioned language is an "advisory opinion" and "inconsistent with RCFC 40.2" and therefore in issuing the April 26, 2004 Memorandum Opinion and Final Judgment there has been a "manifest error of law." *Id.* at 464–69, 2004 WL 905412, *3–9.

1. **The April 26, 2004 Memorandum Opinion And Final Judgment Contains No Language That Would Be Constituted As An Advisory Opinion.**

■ It is well established that the court does not have jurisdiction to "render advisory opinions." *Fina Oil & Chemical Co. v. Ewen*, 123 F.3d 1466, 1470 (Fed.Cir.1997). The constitutional offense to advisory opinions is founded in the requirement of Article III that a case or controversy must exist before the court exercises jurisdiction. On one hand, the Government has represented that the Navy has no present intent to solicit contracts for additional FACT target boats; on the other hand, the Government asserts that "the Court cannot judge contracting officer actions that they have yet to occur. And because the Court is limited to review of an actual agency decision, it cannot anticipate and control future agency decisions that have yet to be made." Gov't Mot. to Reconsider at 7.

■ The final judgment language offensive to the Government, however, does not address the merits of any future FACT contracts for which the Navy may solicit offers and most certainly is not an advisory opinion. It simply requires the Navy to notify the offerors for Contract No. N68936–03–R–0097, in the event circumstances change. Moreover, it requires the Navy not to grant any preference or advantage to American Marine, Maximum Thunder, or any entity with which either company has or has had an economic or business relationship in awarding any future contracts for FACT target boats, because the Government represented to the court that this is the Navy's policy.

MS. BURKE: The government takes very seriously the idea that incumbents have no preference in the process. The government takes very seriously that new contractors should be afforded an opportunity

to compete, which is precisely why the language in the past performance section exists. Even if you have done nothing before, we don't take off points for it. There is nothing in the record or anywhere else that indicates the government has any intention to favor Maximum Thunder and American Marine if it chooses to have a new solicitation for a similar item. Nothing at all except the affidavit that the Plaintiff has submitted[.]

March 18, 2004 Hearing Transcript ("TR–II") at 57–58.

\* \* \* \* \* \*

MS. BURKE: I'm also reminded by my co-counsel that the Competition in Contracting Act, which is referred as CICA, does not allow the agency to limit contracting to people who have previously been awarded a contract.

THE COURT: It's not limiting, it's a matter of some type of preference that's included in the factors, relevant experience and past performance. They will have relevant experience and past performance now which they didn't have before.

MS. BURKE: That's correct. Well, they'll have relevant experience. Past performance, again, doesn't necessarily have to be limited to the government.

THE COURT: Well, presumably they will do a good job and won't be disbarred.

MS. BURKE: We hope so.

THE COURT: So you're saying the government would ... entertain some kind of language in some way, language to be sure that everybody is on an equal footing here going into the next bid round, if and when that happens?

MR. LONG: Are you addressing me now, ma'am?

THE COURT: Yes.

MR. LONG: Ma'am, we would have no problem with that whatsoever because that is the truth, that nobody is being excluded from future competition, we have nothing

planned and any verbiage to that effect we would have no problem whatsoever.

TR–II at 60–61

The court has the power under 28 U.S.C. § 1491(b)(1) and (2) in a post award bid protest case to "award any relief that the court considers proper[.]" The court has done that and declined to exercise its injunctive authority, in substantial part, because of representations made by the Government to the effect that plaintiff, and other similarly situated offerors, will have an opportunity to have an offer on a future FACT boat procurements considered fairly, which did not occur regarding Contract N68936–83–R–0097. *See Naplesyacht.com*, 60 Fed.Cl. at 476–77, 2004 WL 905412, at \*15–16.

## 2. The April 26, 2004 Memorandum Opinion And Final Judgment Complies With The Requirements Of RCFC 40.2 Regarding "Related Cases."

RCFC 40.2 defines a "related case" as follows:

Cases are deemed directly related when an earlier filed case and the action being filed: (A) involve the same parties and are based on the same or similar claims; or (B) involve the same contract, property, or patent.

The purpose of RCFC 40.2 is two-fold. First, to ensure consistent application of the law to cases that involve similar legal issues. Second, to make the best use of judicial resources by maximizing the efficiencies achieved by having a judge knowledgeable about transactions with similar issues of fact and/or similar parties preside over subsequent like-kind cases. If the Navy solicits offers for other FACT target boats in the future and if a bid protest is lodged in the United States Court of Federal Claims challenging the Navy's solicitation or award of a contract for FACT target boats that action, as a matter of law, that bid protest will be "based on the same or similar claims" and therefore will be related to this case. *See* RCFC 40.2.

## CONCLUSION

For the aforegoing reasons, the Government's April 27, 2004 Motion for Partial Reconsideration of the April 14, 2004 Memorandum Opinion and Final Judgment is denied.

Both parties will assume their own costs.

**IT IS SO ORDERED.**